## WILLIAM TUBBY v. STATE.

No. A-3367.　Opinion Filed February 20, 1919.

(178 Pac. 491.)

1. **TRIAL—Instruction—Theory of Defense—Evidence.** It is error for the trial court to fail and refuse to instruct on the law applicable to a theory of the defense which the evidence tends to support when the defendant requests it.

2. **HOMICIDE — Murder — Premeditation—Voluntary Intoxication.** Voluntary intoxication is to be considered by the jury in a prosecution for murder in which a premeditated design to effect death is essential, with reference to its effect upon ability of the defendant at the time to form and entertain such a design.

3. **SAME—Manslaughter in First Degree.** A person who commits a homicide while so drunk as to be incapable of forming a premeditated design to kill, if he had formed no purpose to commit the crime prior to the time he became so intoxicated, is not guilty of murder, but is guilty of manslaughter in the first degree.

4. **SAME — Degree — Evidence — Instruction.** In a prosecution for murder, the court should submit the case to the jury for consideration upon every grade of felonious homicide which the evidence reasonably tends to support. Where there was evidence of the intoxication of the defendant which if believed, tended to show that defendant was intoxicated to the extent of lacking the mental capacity to form a premeditated design to take life at the time of the homicide, it was prejudicial error to refuse to submit to the jury an instruction which would authorize the conviction of the defendant of manslaughter in the first degree.

*Appeal from District Court, Carter County;*
*W. F. Freeman, Judge.*

William Tubby was convicted of murder, and his punishment fixed at death, and he appeals. Reversed and remanded, with directions.

William Tubby, a Mississippi Choctaw Indian, together with one Jim Stribbling, another such Indian, were jointly informed against in the district court of Carter

county, charged with the murder of one Matt Hooper, which was alleged to have occurred in that county on or about the 15th day of February, 1918.

A severance of trial was asked by the defendants, and the state elected to try William Tubby first. His trial resulted in a conviction of murder on the 8th day of March, 1918, the jury assessing the death penalty.

Tubby and Stribbling both lived near the town of Kiowa, in Pittsburg county, Okla., and had come to Ardmore some two or three days prior to the commission of this homicide. During that time each of them had procured for himself a six-shooter, and continued to carry same concealed on his person until up to the time of their arrest.

On the 15th day of February, in the afternoon of said day, Stribbling and Tubby took the Santa Fe train north to the town of Berwyn, a village and station located on said railway about nine or ten miles north of the city of Ardmore. Stribbling had some business to attend to in Berwyn, Tubby merely accompanied him as a companion. After the business was transacted, about 3 o'clock in the afternoon, which was about time for the south-bound Santa Fe train to depart for Ardmore, these parties went to the depot and found that the south-bound train was nearly three hours late. After having learned that the train was late, they repaired to a booze joint, and proceeded to drink between them two quart bottles and six pint bottles of Choctaw beer, after which they returned to the depot and took the south-bound train, which left Berwyn about 7 o'clock that evening.

The evidence on the part of the witnesses for the state is to the effect that while on the train between Berwyn and

Ardmore, both Stribbling and Tubby were very boisterous and unruly, each drawing his revolver and threatening passengers on the train. Both appeared to be drinking some, but were able to walk and seemed to be in possession of their faculties of speech, sight, and hearing to such an extent that they realized fully their surroundings, but were imbued perhaps with the idea that they would demonstrate to those assembled in the particular coach in which they were riding that they were bad men and properly armed to carry into execution any desire of which they might become possessed, or any threat which they might make.

No fatal trouble occurred, however, until the train reached and was stopped for the station at Ardmore. Here quite a crowd was leaving the train, and apparently an equal number prepared to take it. The train was a vestibule train, and this defendant, together with his chum Stribbling, started to leave the smoker, which was one of the front passenger coaches, at the north entrance to said coach. Stribbling was in front of defendant Tubby, and when they reached the vestibule of said coach, a young man, smoking a cigarette, started to get on. Stribbling asked him for the cigarette, and the young man handed it to him and stepped on up into the vestibule. The deceased, who was also smoking a cigarette, followed closely behind the young man who had given his cigarette to Stribbling, whereupon Tubby, who evidently had noticed the performance by which Stribbling had got his cigarette from the other young man, demanded of deceased that he give him (Tubby) the cigarette that he (deceased) was smoking, but deceased refused to give Tubby that cigarette, saying that he wanted to smoke it himself. Deceased and Tubby were total strangers, and, so far as either knew,

had never seen each other before. The fact that deceased refused to give Tubby his cigarette seemed greatly to anger Tubby, who immediately pulled out his revolver or pistol and shot deceased through the body, causing him to fall, and inflicting a mortal wound, of which deceased died within a few hours.

The defendant admits the shooting and his codefendant, Stribbling, who was a witness in defendant's behalf, testifies that defendant, Tubby, fired the fatal shot, and that he (Stribbling) had nothing whatever to do with it, and was only endeavoring to keep Tubby out of trouble during the entire time from leaving Berwyn until up to the fatal difficulty. Tubby's entire defense is based on the fact that he drank about three quarts of Choctaw beer during the afternoon of the day of the homicide between the hours of 3 and 7 o'clock, and became so thoroughly intoxicated thereby that he has no recollection whatever of the trouble or shooting, remembering nothing from the time he left the booze joint in Berwyn until he found himself in jail in Ardmore the next day; that he had no design to kill deceased.

About thirty minutes after the shooting, and while deceased was in a sanitarium in Ardmore, the officers took defendant into the presence of the deceased, and the deceased identified him positively as the person who fired the fatal shot, and said that he had not known defendant prior to the time of the difficulty, and had only refused to give defendant the cigarette he (deceased) was smoking when defendant shot him.

Deceased was a farmer, a married man, 35 years old, who resided about two miles south of the town of Marietta, in Love county. He had been to Ardmore that day with

his bröther, who had come to be examined for admission into the army, and was taking the south-bound train home at the time he was shot down by this defendant.

There was no attempt to justify or excuse this killing. The only contention made in behalf of the defendant is that he was so drunk he was incapable of forming a premeditated design to take life. The legal questions involved are discussed in the opinion, which follows.

*Brown & Williams,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

MATSON, J.   While numerous errors are assigned as grounds for a reversal of this judgment of conviction, in view of the disposition made by the court of this appeal, it is only necessary to discuss one of such grounds.

The principle is well established in this jurisdiction that it is error for the trial court to fail and refuse to instruct on the law applicable to a theory of the defense which the evidence tends to support when the defendant requests it.   *Crittenden v. State,* 13 Okla. Cr. 351, 164 Pac. 675, and cases cited in the body of that opinion.

In this case the court limited the jury to a consideration of the defendant's guilt or innocence of the crime of murder alone.   The question of whether or not the defendant was guilty of manslaughter in the first degree was not submitted to the jury, although the defendant requested the court to give the following instructions, which were refused, exception saved at the time, and such refusal made grounds for a new trial, and urged in the petition in error here as grounds for reversal:

"You are instructed that manslaughter in the first degree is when the killing of another person is perpetrated

without a design to effect death by a person engaged in the commission of a misdemeanor, or when perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon, unless it is committed under such circumstances as to constitute excusable or justifiable homicide.

"Refused.   Exceptions allowed.

"W. F. FREEMAN, *Judge.*"

"Gentlemen of the jury, you are told that in the event you should find from the evidence beyond a reasonable doubt that the defendant in this case did kill the deceased as alleged in the information, and that such killing was done without malice or premeditation, in that event the killing would be manslaughter in the first degree, unless you should find the defendant not guilty as herein charged.

"Refused, and exception allowed.

"W. F. FREEMAN, *Judge.*"

"You are told that the punishment for manslaughter in the first degree is by confinement in the state penitentiary for any term not less than four years.

"Refused.   Exception allowed.

"W. F. FREEMAN, *Judge.*"

As bearing on the defendant's premeditated design to effect death, and also as to whether it was error for the trial court to refuse to give the foregoing, as well as other requested instructions hereinafter set out, we quote the following from the testimony of Jim Stribbling, codefendant, and from the testimony of the defendant himself:

Jim Stribbling:

"Q. Where were you on the 15th day of February of this year?   A. Well, I was at Ardmore until that 11:55 run going north.

"Q. Where did you go?   A. Berwyn.

"Q. For what purpose?   A. I went up there on some business.

"Q. Did you transact your business in Berwyn?    A. Yes, sir.

"Q. What did you do, come back here?    A. Yes, sir.

"Q. What time?    A. I was aiming to get back on the 3 something that run through Berwyn; it was late; two hours and 40 minutes late at Berwyn.

"Q. About what time did the train leave Berwyn?    A. About 6 something.

"Q. Was it before or after dark?    A. It was getting dusk when we left Berwyn.

"Q. Did you get through with your business up there? A. Yes, sir.

"Q. What time did you get through?    A. Between 3 and 4 o'clock.

"Q. Who was your business with?    A. Between Mr. Fisher and Ollie Sparks.

"Q. What Fisher, F. W. Fisher?    A. F. S. Fisher.

"Q. The man that has been here on the jury this term of court?    A. Yes, sir.

"Q. What time did you get through with them?    A. Between 3 and 4.

"Q. Up to that time had you drank any beer or whisky that day?    A. No, sir.

"Q. When you got through with these people what did you intend to do?    A. Aimed to catch the train and come to Ardmore.

"Q. What did you find out?    A. I went down and asked—

"Q. Did you find out whether the train was on time? A. Yes, sir.

"Q. Was it?    A. No, sir.

"Q. After that what happened?    A. After we saw the train was late we went down and got some beer.

"Q. What kind of beer?   A. Choctaw beer.

"Q. How much did you get?   A. Two quarts and six small bottles.

"Q. From whom did you get it?   A. Payton Little.

"Q. What does he do in Berwyn?   A. Runs a restaurant and sells Chock.

"Q. Was this new or old Choctaw beer?   A. Old.

"Q. What is the difference between old and new?   A. The old Choctaw beer is stronger than the new.

"Q. How much did you drink?   A. I drunk about a quart and two or three small bottles.

"Q. Who was with you?   A. Bill Tubby.

"Q. He all the one with you?   A. Yes, sir.

"Q. Where did you come from?   A. Kiowa.

"Q. When did he come over here?   A. He came over with me.

"Q. Where had you been?   A. Kiowa.

"Q. When did you go up there?   A. I moved up there three or four weeks ago.

"Q. Move from out here?   A. Yes, sir.

"Q. Say he came down here with you?   A. Yes, sir.

"Q. How long had he been here?   A. Been here about a couple of days.

"Q. About two days?   A. Yes, sir.

"Q. Been with you all the time?   A. Yes, sir.

"Q. Had he been drunk at any time?   A. No, sir.

"Q. Had he been drinking?   A. No, sir.

"Q. You stated that you drank a quart and two or three small bottles?   A. Yes, sir.

"Q. What became of the rest of it?   A. Bill drunk it.

"Q. State, if you know, what effect it had on him.

"The County Attorney:  Object; incompetent, irrelevant, and immaterial.

"The Court:  Overruled.

"A. Well, it had a right smart of effect on him at the time; it was strong, and he wasn't used to drinking much of it.

"Q. Well, state what condition he was in before you left Berwyn.  A. Getting pretty drunk when he left Berwyn; I had to lead him to the train when it come up.

"Q. Did you get him on the train?  A. Yes, sir.

"Q. When you got him on the train, how was he?  A. Pretty full when he got on the train.

"Q. Did you come to Ardmore?  A. Yes, sir.

"Q. State whether or not he was drunk when you got to Ardmore or near Ardmore.

"The County Attorney: Object to that; calls for a conclusion of the witness.

"A. Yes sir.

"Q. What was he doing, if anything?  A. He was just drunk, is all."

We quote from the defendant's testimony as follows:

"Q. What do you do for a living?  A. I have been working in the mines for some length of time.

"Q. When did you come to Ardmore first?  A. Wednesday, if I am not mistaken.

"Q. What day of the week was this trouble?  A. Friday the 15th.

"Q. You came Wednesday before that Friday?  A. No, we come Tuesday.

"Q. How did you come?  A. On the Rock Island train.

"Q. Where did you take the train?  A. Pittsburg.

"Q. Where did you get off?  A. Ardmore.

"Q. How long did you stay in Ardmore? A. Until Friday noon; we got on the noon train.

"Q. Where did you go? A. Berwyn.

"Q. Had you ben to Berwyn before? A. We went to Berwyn the day before.

"Q. How long did you stay? A. Stayed just a short time.

"Q. Did you come back that day? A. Yes, sir.

"Q. Were you ever in the town of Thackerville? A. No, sir.

"Q. Never in Marietta? A. No, sir.

"Q. Ever live in that country? A. No, sir.

"Q. This last day you went to Berwyn, what did you do? A. Jim had some business to fix up of his and I went with him.

"Q. Had Jim been to your house? A. Yes, sir.

"Q. At that time you lived at your father's? A. Yes, sir.

"Q. Have you any brothers? A. Yes, sir.

"Q. How many? A. Five.

"Q. How many sisters? A. Three.

"The County Attorney: We object to all that; incompetent, irrelevant, and immaterial.

"The Court: I don't see its materiality. Go ahead.

"Q. I will ask you, when you got to Berwyn, what you done? A. Well, Jim went to transact a little business over there with the bank.

"Q. Did you go with him? A. Yes, sir.

"Q. Who did he transact the business with? A. I don't know the man; Fisher is his name, I think.

"Q. What time did you get through at the bank? A. Between 3 and 4 o'clock.

"Q. After you got through at the bank, what did you do?   A. Went to the depot to see if the train was on time or late.

"Q. What did you find?   A. The train was two hours and 40 minutes late.

"Q. What happened?   A. We walked back to this restaurant.

"Q. Up until that time had you drank any beer or whisky?   A. No, sir.

"Q. Were you sober?   A. Yes, sir.

"Q. What happened at that restaurant?   A. We went in the restaurant and got some beer.

"Q. How much?   A. Two quarts and six little bottles.

"Q. How large were they, the little bottles?   A. I suppose they were pints; they were pints.

"Q. What kind of beer was that?   A. Choctaw.

"Q. Who drank it?   A. Jim drank part, and I drank the rest.

"Q. Who drank the most?   A. I drank the most.

"Q. State to the court and jury what effect it had on you, if you know.   A. It absolutely run me crazy, that's all.

"Q. I will ask you, before the train came, what condition you were in.   A. I don't remember when the train got there.

"Q. Do you know how you got on the train?   A. No, sir.

"Q. Had you been in the habit of getting drunk?   A. No, sir.

"Q. Been in the habit of drinking this kind of stuff? A. No, sir.

"Q. When you are at home do you work?   A. Yes, sir.

"Q. Had you had any trouble prior to this?   A. Yes, sir; I got in a little trouble a few years ago.

"Q. What was it? A. I got into a little deal with some fellows selling some horses.

"Q. You were tried for it? A. Yes, sir.

"Q. What happened? A. After they found out I wasn't guilty of what I was charged with they turned me loose.

"Q. Did you go back home? A. Yes, sir.

"Q. I will ask you if you have been in the habit of drinking. A. No, sir.

"Q. Or carousing around? A. No, sir.

"Q. When you left Berwyn, did you know where you had started? A. No, sir; I knew that afternoon that I got this stuff that I intended to come back to Ardmore.

"Q. What happened then? Tell the jury. A. After I got this stuff?

"Q. Yes, sir. A. I don't remember.

"Q. You and Jim drank it all? A. Yes, sir; we drank all the beer.

"Q. I will ask you where you were the next time you knew anything? A. I had started toward the depot back of this house.

"Q. What, the restaurant? A. Started out the back door of this place.

"Q. What happened next? A. I don't know what happened next; I went crazy.

"Q. State to the jury whether or not you were drunk. A. I was crazy drunk; absolutely crazy; didn't know a thing in the world.

"Q. Where were you when you next knew anything? A. Next I was in jail.

"Q. What place? A. The county jail.

"Q. At Ardmore? A. Yes, sir.

"Q. When was that? A. The next morning.

"Q. Had you been in jail before. A. No, sir.

"Q. Did you know anything about it until next morning? A. No, sir; I didn't know where I was at until next morning. I asked the boys in jail where I was the next morning.

"Q. I will ask you if you knew this man that was killed. A. No, sir.

"Q. Had you ever seen him? A. No, sir.

"Q. Did you have any malice or ill will or hatred toward him? A. No, sir; I can't hardly realize yet that happened; what they got me charged with.

"Q. I will ask you if you ever had any ill will or hatred against anybody. A. No, sir.

"Q. Did you intend to kill this man? A. No, sir; I never had a desire in my life to harm a living soul.

"Q Do you have any knowledge of shooting him or trying to kill him? A. No, sir; none whatever."

The defendant also requested the following instructions:

"You are instructed in this case that voluntary intoxication is no defense in a criminal case, but in your deliberations on the question of whether or not the defendant shot the deceased with the intent to kill him or to do him serious bodily harm, you may take into consideration the question of whether or not they were intoxicated to such an extent that they were incapable of forming an intent. And in this case if you find and believe from the evidence or if you entertain a reasonable doubt thereof from all the facts and circumstances in evidence in this case, that the defendants at the time of the homicide were in such an intoxicated condition that they were incapable of forming an intent, and that they did not intend to kill and murder the deceased, then you are instructed that you should find the defendants not guilty of the crime of murder.

"Refused, and exception allowed.

"W. F. FREEMAN, *Judge.*"

"Should you find from the evidence in this case or have a reasonable doubt thereof that the defendant at the time he committed the crime complained of in the information was intoxicated to such an extent that he was not able to form within his mind the criminal design to effect the death of the deceased, then, in that event, should you find from the evidence that he did kill the deceased, it will be your duty to find the defendant guilty of manslaughter in the first degree, and acquit him on the charge of murder.

"Refused, and exception allowed.

"W. F. FREEMAN, *Judge*."

The only instruction bearing on the question of the intoxicated condition of the defendant at the time of the commission of the homicide given by the court is as follows:

"Defendant has testified for himself and has introduced other testimony to show that at the time of the alleged commission of the offense, that the defendant was intoxicated to such an extent that he was incapable of knowing what he was doing.

"In this connection you are told that a person who voluntarily becomes intoxicated to such an extent and for such a period of time as to cause unconsciousness of his acts is not irresponsible under the law for the acts done by him while in such mental condition.

"You are further told that the fact of such intoxication, if you should find that the defendant was so intoxicated, may be considered by you in mitigation of the punishment, should you find the defendant guilty.

"In the very language of the statute: 'Homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time.' "

Counsel for the defendant objected to and saved the proper exception to the foregoing instruction at the time it was given.

It is well established in this state that voluntary in-
toxication existing only temporarily at the time of the com-
mission of homicide is no justification or excuse therefor;
that in order to justify or excuse a killing by reason of
alcoholism, a mental condition of the defendant must have
been produced thereby which rendered the defendant in-
sane to such an extent as to deprive him of the mental
capacity to distinguish between right and wrong as applied
to the particular act, whether he was under the influence
of intoxicating liquor at the time of the commission of the
act or not, and in order to relieve a defendant of criminal
responsibility, the insanity produced by the use of intoxi-
cating drinks must be such as to be settled or fixed, and not
a mere temporary fit of drunkenness. *Cheadle v. State*, 11
Okla. Cr. 566, 149 Pac. 919, L. R. A. 1915E, 1031.

There is no evidence in this case that would either
justify or excuse this defendant for the killing on the
ground of insanity produced by the use of intoxicating
liquor.   But there is evidence on the part of nearly all of
the state's witnesses who were present at the time of the
killing to the effect that the defendant was in a drunken
condition.   The evidence of the codefendant is that the de-
fendant was drunk, and that it was necessary for the co-
defendant, Stribbling, to assist him in getting on the train,
and that he appeared to be drunker when the train reached
Ardmore than when he boarded it at Berwyn.   The defend-
ant testified that he was "crazy drunk" at the time of the
shooting; that he remembers nothing of it; that he did not
know the deceased, had no malice in his heart against him,
and did not intend to kill him or any other human being;
that if he fired a shot at all, he did so without knowledge
that he was doing it, and without any intent to murder, all
of which lack of design on his part is attributable, if at all,

to his intoxicated condition. The evidence also shows that this intoxicated condition of the defendant was voluntary, so that, being voluntary, he can neither justify nor excuse the killing on that ground.

But voluntary intoxication may be considered by the jury in a prosecution for murder alleged to have been accomplished with a premeditated design to effect the death of the deceased with reference to whether or not the defendant, at the time of the killing or shooting, entertained such a design. The testimony of the defendant, and of his codefendant, Stribbling, considered in the light of the circumstances surrounding this killing, clearly places him within the rule last above stated; if their testimony is to be believed there was no premeditated design to kill.

It is the view and opinion of this court that under the circumstances it was error for the trial court to refuse to instruct on manslaughter in the first degree in this case, and on the question of intoxication with reference to its effect upon the mental condition of the defendant in regard to the formation of a premeditated design to effect the death. A state of intoxication, such as will reduce homicide from murder to manslaughter in the first degree, is a question of fact for the jury to determine, under proper instructions by the court.

That part of the court's instruction No. 5 which states:

"You are further told that the fact of such intoxication (voluntary intoxication), if you should find that the defendant was so intoxicated, may be considered by you in mitigation of the punishment should you find the defendant guilty"

—does not fully or correctly state the entire law applicable to the facts in this case and necessary to be given the jury

for their information and guidance in giving a verdict. The trial court entirely overlooked the fact that intoxication, though voluntary, might be considered by the jury to show an absence of the premeditated design to kill for the purpose of determining whether the offense was murder or manslaughter in the first degree.

The evidence in this case and the principles of law applicable thereto are substantially in accord with those in *Cheadle v. State, supra,* which opinion contains a thorough, able, and full discussion of the law applicable to felonious homicide committed while intoxicated. The opinion in that case was filed May 1, 1915, and officially published in the latter part of the year 1915, over two years before this trial occurred. A doctrine so long established should have been familiar to the bench and bar by March, 1918.

This killing is greatly to be deplored. A young man, in the prime of life, married and the head of a family, is shot down without justification or excuse by a drunken brute. Perhaps the jury would have discarded as untrue the story of the defendant, and have found him guilty of murder, even had the court instructed on manslaughter in the first degree; but as the court refused to so instruct, although requested to do so, and the evidence in behalf of the defendant would reduce the grade of felonious homicide to that of manslaughter in the first degree, and the question of the extent of his intoxication being one of fact exclusively to be determined by the jury, the fact that the court deprived him of this theory of his defense was clearly prejudicial to him, and for that reason a new trial must be granted.

For the reasons stated, the judgment is reversed, and the cause remanded for further proceedings in accordance

herewith, and the warden of the state penitentiary is instructed to surrender the defendant to the sheriff of Carter county, Okla., upon proper demand therefor.

DOYLE, P. J., and ARMSTRONG, J., concur.