# HENRY LOVETT v. STATE.

No. A-8135.   Opinion Filed July 22, 1931.
(1 Pac. [2d] 800.)

James H. Mathers and J. A. Bass, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, P. J.   The plaintiff in error, hereinafter called the defendant, was convicted of murder and his punishment fixed at death.   Motion for new trial was

filed, considered, overruled, exceptions saved, and the defendant appeals.

The testimony on behalf of the state is, in substance, as follows: F. H. Morris stated:

"I was president of the First National Bank of El Reno on the 26th day of November, 1930; on that date there was an attempted robbery of the bank and a man was killed; I saw the defendant when he came in the front door of the bank; he leaned over the railing at my left with a gun in his right hand;" witness then described the plat that was shown him as to the arrangement of the furniture of the bank; "Mr. Jess M. Burge had left his desk and was about midway of his cage and stopped; he walked to the front of his desk and shot Lovett through his cage; I had heard one shot before that; the shot I heard came from the lobby where the defendant Lovett was; I did not see who was shot at the time; Lovett shot at me or in my direction, I was just behind the post in the last cage; when the defendant fired the second shot toward me he was in front of the window; after the defendant shot at me he fired one more shot and left the bank, going out by the front door; after the shooting was over I heard this young man at the front groaning or breathing hard; I did not know Dee Foliart personally. The next thing I knew I saw the officers loading Lovett in a car; when the defendant left the bank he went out at the front door and on around to the left and back to the alley. When the defendant first came in the bank, he said, 'Get back, I mean business;' he had a gun in his right hand, and there was a glove on his left hand. I saw the defendant in the hospital room after the trouble. I spoke to him, and he says, 'I am sorry.'"

The witness then described the bullet found in the bank and stated that a bullet fired from the defendant's gun went through his trousers.

Ed Lyman testified on behalf of the state:

"I lived in El Reno on the 26th day of November, 1930; I was in the First National Bank of El Reno between 12 and 1 o'clock; the defendant now in court looks like the man that was in the bank, but I am not certain about it; the first thing that attracted my attention was a command to get back; I did not know who made the command until I looked up and saw the man with the gun; he was almost straight east of the line of cages; when he made the command I obeyed the order; when I got to the vault I turned and looked back and saw a man standing near one of the doors leading into the bank; he was inside of the building before I saw him; the defendant turned toward that door with some kind of a command and fired at the man who had just come in the door; after the shot was fired I could not tell exactly what did happen but there were two shots fired; after Lovett shot Dee Foliart he turned toward the door; the man standing at the door slumped down; I could not tell what the defendant said before he shot the man by the door; from the time he spoke until the shot was fired was not more than a couple of seconds; after these shots were fired I went into the vault; the defendant then turned his hand toward the cage and the other shot was fired; I don't know whether he fired across there or not, there was considerable smoke in the room."

On cross-examination witness stated:

"The man that came into the bank was a stranger to me, so far as I know I had never seen him before; there is no obstruction between the vault and the lobby of the bank except the cages and railings."

Witness then testified to what took place in the vault the same as on direct examination.

Miss Georgia Cox, testifying for the state, stated:

"I was seated with my back to the front of the bank; some man passed me and went into the vault; I got up from my desk and went to answer the telephone; when I picked up the receiver I saw a man on the west side of

the north door with a gun in his right hand; when I answered the phone it was Geary calling Mr. Morris; I told Mr. Morris some one wanted him over the phone; there was another man standing on the east of the north entrance to the bank; as I looked at this man he raised the end of his pistol and fired; I saw the flash and saw the deceased, Dee Foliart, the young man on the other side of the door, hump and started to fall; he just crumpled up; that is all I saw; the defendant started to whirl and I turned and went into the vault; I did not hear the defendant say anything to Mr. Foliart or Mr. Foliart say anything to Mr. Lovett; I knew the deceased only as a customer of the bank; he was the assistant coach at the high school; the man I saw fire the shot at Dee Foliart is now in the courtroom; he did not have glasses on then; if I could see him without his glasses I could tell whether or not he was the same man." Witness then identified the defendant as the man who shot the deceased, Foliart.

The record is voluminous in minor matters pertaining to what took place in the bank. The testimony shows that the defendant came into the bank and commanded the officers and those in the bank to get back, and started to march them into the vault; about the time he gave the command the deceased appeared through the north door of the bank, and had just gotten inside, when, without a word as far as the witness heard, the defendant fired the shot that killed the deceased; several other shots were fired thereafter; the defendant left the bank and started down the alley and was fired on and captured and taken to jail, where he received treatment for his wounds. The defendant was positively identified as the man who fired the shot that took the life of the deceased, and as the man who had attempted to hold up the bank and rob it at the time.

The defense of the defendant is that he knew nothing that took place at the bank; he testified in his own

behalf that he came from Liberal, Kan., to El Reno, in the afternoon prior to the date of the trouble at the bank; he had but a few cents in money and fell into company with some parties who had some canned heat; he took two drinks of the canned heat the evening before the killing took place in the bank and from then until the time he came to himself some time after the trouble, in the county jail, he did not know anything; he did not know he had been in the bank or that he had attempted to rob the bank; did not know he had shot the deceased, and claims he did not know where the First National Bank in El Reno was located; in other words, he had no recollection of anything that took place from the time he drank the canned heat until he was lodged in jail.

The defendant also testified that several years prior to the trouble he had fallen and injured his head, and that he had been thrown from a horse that injured his head; that he suffered from severe headaches. He also called a number of witnesses who testified to the actions of the defendant at times as being morose and noncommunicative; and to such conduct of the defendant that led them to believe the defendant was insane.

Testimony in rebuttal was introduced showing an X-ray of the defendant's head, and the doctor stated in his opinion there was no injury in the head or neck that would in any way whatever contribute to insanity.

The defendant admitted that the gun introduced in evidence was his, and claims he traded for it in Oklahoma City some time prior to the trouble; that his purpose for having the gun was for his protection, as he was riding over the country in box cars, or any other way to get conveyance, and sleeping out nights. The substance of the defendant's testimony is that he does not know

anything about the transaction at the bank; that if he was present and fired the shot that killed the deceased, and attempted to rob the bank, he knows nothing about it whatever.

Fourteen errors have been assigned by the defendant as grounds for reversal of the case. The first assignment being: "The trial court erred in overruling the motion of the defendant below for a new trial; to which exceptions were then and there saved."

The defendant has divided his assignments of errors and discussed them under three propositions; the first proposition discussed by him and included in his motion for a new trial is: One is not competent to serve as a juror when there exist any business relations between him and one of the parties which may tend to influence the verdict of the juror.

The record in this case discloses that, when the jury had been selected and was about to be sworn, the defendant renewed his request for additional challenges, alleging that the court committed error in overruling the challenge of the defendant to certain jurors now in the box, which said jurors testified they were under obligations and indebted to the First National Bank of El Reno, Okla., of which the prosecuting witness Mr. Morris was the president, and therefore we have exhausted all of our challenges and now ask the court for additional challenges.

An examination of the record shows that the testimony of only two jurors on their voir dire was reported by the court reporter; one of the jurors, Mr. Lorenzen, whose testimony was reported, was excused by the defendant, and the other juror, Mr. Eicholz, was excused by the court. We fail to find anything in

the record showing that the defendant had exhausted all his peremptory challenges, nor have we been able to find where either of the jurors who sat in the trial of the case admitted, as stated by the defendant, that he was under obligation to the bank and owed it money. Defendant cites several cases in support of his contention which state correctly the law, if the facts in the record supported the contention of the defendant. However, there is nothing in the record to sustain the defendant's contention. The record is silent as to any challenge for cause by the defendant on the ground that the juror was indebted to the bank as urged by the defendant. The first proposition of the defendant is without merit, and his contention is not borne out by the record.

The second proposition argued by the defendant is: "That the defendant was voluntarily intoxicated at the time of the attempted robbery and in consequence was unable to form an intent. The question of whether by reason of his condition he was engaged in a felony or misdemeanor is one of fact and should be submitted to the jury under appropriate charge. Any charge that assumes that there was a felony committed under the circumstances shown is error."

In support of this proposition the defendant earnestly insists that he was intoxicated, the result of drinking canned heat; but he had lost his mind and knew nothing that was going on from the time he drank the canned heat the night previous to the robbery and killing, and did not remember he had ever been in the bank. The defendant made a strong effort to bring himself within the rule laid down by the court with reference to voluntary intoxication, but in the opinion of the court the effort of the defendant wholly failed, and the jury by its verdict said that it did not believe the defendant's statement that

he was so drunk at the time of the commission of the crime charged against him that he did not know where he was or what he was doing. The evidence wholly fails to show that the defendant Lovett was drinking or in the least intoxicated at the time of the trouble at the bank. An attempt was made to show this but in the opinion of the court it failed. The defendant said he drank the canned heat the night before and it made him sick, and then denied any knowledge of what took place the next day.

In Ray v. State, 10 Okla. Cr. 403, 136 Pac. 980, a similar question was considered by the court. The evidence in that case conclusively showed that the defendant had been drinking whisky and was drunk, as it is attempted to be shown in this case. The defendant requested an instruction on manslaughter, but it was refused. The second syllabus of the case reads as follows:

"When the facts plainly disclose that a homicide occurred in an attempt to perpetrate a robbery or other felony, the issue of manslaughter should not be submitted to the jury. Premeditated design to effect death is not an element of murder committed in the perpetration of a felony."

The defendant relies on Pusley v. State, 22 Okla. Cr. 192, 210 Pac. 306, to sustain his position that the court erred in not instructing the jury upon the question of manslaughter. An examination of the Pusley Case clearly shows that the facts and circumstances are not the same as the facts in this case. In the Pusley Case the defendant did not deny the assault, but for his defense relied upon the fact that he had been drinking the day of the assault and did not recollect what had occurred.

In this case the defendant denies being in the bank or knowing anything about what took place there, and

we think the ruling of the court in Ray v. State, supra, sustains the ruling of the trial court, and that the court did not err in refusing to instruct the jury upon the question of manslaughter on the ground of the intoxication of the defendant, as the proof wholly fails to show the defendant was intoxicated at the time of the attempted robbery and killing of Dee Foliart. Defendant cites a number of cases in support of his contention, but we do not think they are applicable to the facts in this case.

The third proposition urged by the defendant as grounds for reversal of this case is that:

"When the evidence shows that a defendant was intoxicated to such an extent, when he slew another, so he could not form an intent, he was entitled to a charge that he could be convicted of the least degree of such offense if the jury believed that by reason of his condition, he was incapable of forming an intent, and to refuse such instruction is error."

In support of this proposition the defendant insists that it was a question of fact as to whether a felony or misdemeanor was committed by the defendant, and that, in view of the fact that the defendant in all stages of the acts shown by the record to have been done by him on November 26, 1930, such acts being one continuous act, he was entitled to his special instruction No. 1, which was refused by the court.

This instruction raises the same question that was discussed by the defendant in his second proposition. The court in its instruction properly declared the law as applied to the facts in this case, and it was not error to refuse to give defendant's special instruction No. 1. The defendant cites in support of his contention that his special instruction No. 1 should have been given: Tubby v. State, 15 Okla. Cr. 496, 178 Pac. 491. In the Tubby Case

there is no evidence that the defendant was engaged in the commission of a felony at the time of the homicide. Tubby was not engaged in the robbery of a bank when he killed Matt Hooper.

In Miller v. State, 9 Okla. Cr. 55, 130 Pac. 813, cited and relied upon by the defendant, there was no evidence that the defendant was committing a felony other than murder. It is unfortunate that individuals committing crime in attempting to rob banks take the life of an individual, but in this case the record is clear that the defendant went to the First National Bank in El Reno, and in an attempt to rob it, without any justification, shot and killed Dee Foliart. In the trial of his case he had a fair and impartial trial. The court properly instructed the jury as to the law applicable to the facts in the case. A careful and serious reading and consideration of the record shows that there were no fundamental or prejudicial errors committed by the trial court. The testimony is sufficient to sustain the judgment. The judgment appealed from is therefore affirmed.

It is further ordered by the court that the warden of the state penitentiary proceed to carry into execution the judgment of the district court of Canadian county in this case, and the 25th day of September, 1931, is fixed as the day for the sentence as pronounced.

EDWARDS and CHAPPELL, JJ., concur.