## SAM CHOATE v. STATE.

No. A-3640. Opinion Filed May 16, 1921.
Rehearing Denied June 13, 1921.
(197 Pac. 1060.)

(Syllabus.)

1. **Homicide—Voluntary Intoxication as Reducing Degree of Crime.** Where an unlawful homicide is established, and alleged to have been committed with a premeditated design to effect death, and it appears that the person charged was in such a state of voluntary intoxication as to preclude a premeditated design or intent to take human life, the offense is reduced from murder to manslaughter in the first degree.

2. **Criminal Law—Criminal Responsibility—Effect of Involuntary Intoxication.** Where the accused, by fraud, deception, or artifice is misled or imposed upon, and is induced to freely imbibe a medicinal alcoholic preparation, without knowing its properties or narcotic ingredients, resulting in intoxication or temporary insanity, such intoxication would not be "voluntary intoxication," within the meaning of the law; and if the mental condition was such that the defendant had no knowledge or comprehension of his acts, and was unable to discern right from wrong, he would be, under such circumstances, guilty of no crime.

3. **Homicide—Murder—Criminal Responsibility of One Intoxicated by Deception.** If the mental condition of a defendant charged with murder was the result of involuntary intoxication brought about by the design, fraud, or deception of others, and he was still able to discern right from wrong and adhere to the right and avoid the wrong, the defendant would be guilty of murder or manslaughter, as the case might be, to be determined by other facts, as in other cases.

4. **Same—Instructions.** Instructions relating to voluntary intoxication, involuntary intoxication, premeditated design, and reasonable doubt, examined and found sufficient.

5.  **Trial—Instructions—Definition of Reasonable Doubt.** The term "reasonable doubt" is a simple expression that jurors of average intelligence will comprehe... without defining, and unless requested by the defendan... dinarily an instruction defining reasonable doubt need not be given.

Appeal from District Court, Jackson County; Frank Mathews, Judge.

Sam Choate was convicted of manslaughter in the first, degree, and he appeals.     Affirmed.

S. B. Garrett, for plaintiff in error.

S. P. Freeling, Atty. Gen., and W. C. Hall, Asst. Atty. Gen., for the State.

BESSEY, J. Sam Choate was on the 23d day of January, 1919, convicted of manslaughter in the first degree, for the killing of Pink Murphy on the 6th day of October, 1918. From the judgment and sentence of the trial court, he appeals to this court.

The evidence discloses that at the time of the homicide Sam Choate, plaintiff in error, hereinafter called the defendant, was a farmer, 62 years of age, residing about four miles, west of Altus, in Jackson county, Okla., where he had lived for some time with his family, consisting of a wife and several children.     The deceased, Pink Murphy, lived in the little town of Duke, in Jackson county.    The state's witnesses, Jim McKibbon, J. D. Busby, and Arthur Middleton, together with the deceased, had for some time made a practice of playing cards for money.    All of the parties named were in Altus on Saturday, the day preceding the homicide.     The defendant, Sam Choate, who habitually or at intervals indulged in the excessive drinking of alcoholic medicines as a beverage, on this Saturday had drunk considerable quantities of a preparation known as "Beef, Iron and Wine," and possibly some alcoholic extract.    At that time the defendant had on his,

person over $400 in money.    Defendant was more or less under the influence of intoxicants that night, and Busby took him to the Wichita rooming house, where they remained all night.

There is evidence to show that some of the witnesses named, and possibly some others, knew that the defendant had this amount of money.   On Sunday morning Arthur Middleton told the defendant that he, Pink Murphy, McKibbon, and Busby were going out to where they were the Sunday before to play cards, and that, as they were going near the defendant's home, he could ride in the car with them.    Before leaving town, the defendant and Middleton purchased four bottles of Beef, Iron and Wine, and defendant took two or more drinks from one of the bottles.

A little later Pink Murphy, the deceased, came around with his car, and he, with the defendant and the other witnesses named, started west towards the defendant's home. There was more drinking along the road, and the defendant became sick, and vomited.   The parties went on some 10 or 12 miles to Turkey creek, passing the road where the defendant should have left the car to go home.   They drove the car off of the road some distance, and took a curtain or oil cloth from the car, carried it across a private wagon bridge into a depression along the creek, spread it on the ground, and began playing a game of cards called "stud poker."

The defendant claimed that, after drinking some more of the dope along the road with the other parties, he had no recollection of anything that occurred.

The testimony of those engaged in the card game was that after they had played for some time it was agreed that Middleton should drive back to Duke to get more bitters. At this time the defendant was about even in the game, but the deceased had lost a considerable sum of money; that

Busby and Murphy were joshing each other, and that Murphy told Busby that he would "knock him in the creek," meaning that he would win all his money; that Busby said that the whole bunch couldn't do that. The defendant then told Murphy to "take it back," and Murphy said that they were old friends and could say what they pleased to each other, and that he wouldn't "take it back." The defendant said if he didn't he would kill him; that Murphy was sitting on the ground next to a tree, with his arms around his knees; and that the defendant reached over and stabbed Murphy with his knife; that Murphy fell over on his side, and Busby said, "You have killed the best friend you ever had," and that defendant said, "Yes, I intended to do it, but I am sorry for it."

Middleton went to Duke for a doctor. McKibbon gave Murphy some water, and the deceased said he didn't think he was badly hurt. The doctor came and gave the deceased some medicine, placed him in a car, and started to Duke, but he died before they arrived there, and within an hour after the difficulty occurred.

After the stabbing the defendant went across the creek, along the bank some hundred yards or more distant, where he was later found by a deputy sheriff and Jim McKibbon, lying on the creek bank near the water's edge, apparently in a drunken stupor. There was an open pocket knife by his side, and about $350 in bills, some in a roll and some scattered around between his legs. They also found a little piece of tobacco lying there. After rousing the defendant and getting him to stand up, he said to the deputy sheriff, "Are you going to shoot me?" The defendant was helped up the bank, from where he walked to the car without assistance, on the way they had to cross a fence, and defendant crawled through without assistance, and came up to the car and shook hands with old man Eckles.

No questions were asked the defendant by any of the parties, or any statements made, indicating whether Pink Murphy was dead or alive, and after they had gotten into the car and started towards town, the defendant asked the deputy if the fellow was dead, and was told that he was not.    Defendant said he was glad he was not dead, and cried about it; then talked on in a rambling way.    Presently he asked the deputy if he got his money and his knife, and, when told that he had, slapped him on the shoulder and said, "You're all right, kid."    Further on, the defendant said they had taken him out there to rob him, but that they had not done it.    There was more rambling conversation that need not be recited here.

The sheriff testified that, shortly after the defendant was placed in jail, he heard the defendant state that he was standing up a few steps from where they were, and that they called him up there and said, "You have killed him," and then he said he walked off and holloaed for help.

The defendant claimed that he had no recollection of playing cards, or of any difficulty with the deceased, and knew nothing about the knife wound that caused his death.

The theory of the defense was that the defendant did not strike the fatal blow, or any blow; or, that if he did strike the blow, it was in a drunken effort to keep the gamblers who had him in charge from taking his money; that, by reason of his having drunk a great quantity of alcoholic medicine, he was totally unconscious of any act.

It is here urged that the homicide was excusable, for the reason that the defendant was so beastly drunk at the time he took the life of Pink Murphy that he was unable to form an intent or design to take his life, or that the wound was inflicted by some other person, and that they took advantage

of his drunken, maudlin condition for the purpose of holding him responsible for the act of some other person in the party; that the intoxication was not voluntary, but was brought on by the artifice or connivance of the other members of the party for the purpose of enabling them to get his money in a poker game.

Section 2095, Rev. Laws 1910, provides as follows:

"No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition."

Section 2316, Rev. Laws 1910, is as follows:

"Homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time."

It has been held by this court that voluntary intoxication may be shown in mitigation of the offense, when one is charged with murder, where the person is in such a state of intoxication as to preclude a premeditated design or intent to take human life. In such a case the crime is not murder, but manslaughter in the first degree. Updike v. State, 9 Okla. Cr. 124, 130 Pac. 1107; Cheadle v. State, 11 Okla. Cr. 566, 149 Pac. 919, L. R. A. 1915E, 1031; McCarter v. State, 14 Okla. Cr. 305, 170 Pac. 712; Tubby v. State, 15 Okla. Cr. 496, 178 Pac. 491.

The court instructed the jury upon the question of voluntary intoxication, as affecting a premeditated design to kill, as follows:

8. When an unlawful killing is established, and alleged to have been committed with a premeditated design to effect death, the condition of the mind of the party doing the killing at the time of and just prior to the killing is an important consideration in determining whether or not murder has been committed with a premeditated design to effect death. The important questions for the jury to determine

are: Do the facts and circumstances in the case, at the time of the killing and before that time, having connection with or relating to it, establish beyond a reasonable doubt a formed design in the mind of the person doing the killing to take the life of the person slain? If they do, the killing will be murder.

9. You are charged that neither intoxication nor temporary insanity of the mind produced by the voluntary recent use of intoxicating liquors constitutes an excuse for the commission of a crime, the penal statutes upon that subject being as follows: ''Homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time.''

\*   \*   \*   \*   \*   \*   \*   \*

However, in a case where the defendant is accused of murder, as in the case before you, evidence of such intoxication or temporary insanity of the mind produced by the recent voluntary use of ardent spirits may be received by you to determine whether or not the defendant's mind at the time of the difficulty was in such state or condition as to prevent him from deliberately forming the specific intent to take life.

10. If you believe that at the time of the alleged commission of the act with which the defendant is charged, and for which he is now on trial before you, he was so intoxicated or temporarily insane from the recent voluntary use of intoxicating liquors as to render him incapable of forming a premeditated design to take the life of the deceased and entertaining malice, then you are charged that it would afford no excuse for the commission of the act charged against him, if the act was otherwise criminal, but such intoxication or temporary insanity produced by the voluntary recent use of intoxicating spirits, if you find there was such intoxication or insanity produced by the voluntary recent use of intoxicating spirits; and in that case, should you so find, should you find the defendant guilty of the offense charged against him, then your verdict should be manslaughter in the first degree.

12. \* \* \* If you believe from the evidence beyond a reasonable doubt that the defendant, in Jackson county,

state of Oklahoma, on or about the 6th day of October, 1918, did unlawfully stab and cut, and thereby cause the death of the deceased, but that said act of killing was perpetrated without a design to effect the death of the deceased, and in a heat of passion or in a state of voluntary intoxication, and by means of a dangerous weapon, then you will find the defendant guilty of manslaughter in the first degree, and so say by your verdict.

13. * * * But the court further instructs you that, even though you may find, or have a reasonable doubt thereof, that the defendant, prior to the fatal difficulty, had been induced by the deceased or other persons to become intoxicated, or there had been administered to him a drug or narcotic, but, notwithstanding this fact, should you find beyond a reasonable doubt that at the time of the killing the defendant's mind was in such a condition that he had knowledge of the nature and character of his act; that he knew the same was wrong and criminal, and would subject him to punishment and that he had power left to resist said act of killing; and under such conditions you should find beyond a reasonable doubt that the defendant stabbed and killed the deceased, then you should find him guilty of murder or manslaughter in the first degree, as you may determine.

The quoted parts of the instructions given, together with the instructions considered as a whole, fairly stated the rule applicable to premeditated design in connection with voluntary intoxication.

Under the evidence in this case, the question as to whether or not the fatal difficulty was induced or brought about by design, fraud, or artifice of the deceased or others, causing the defendant to become unconscious by reason of medicinal alcoholic liquors, drugs, or narcotics, was fairly submitted to the jury under the following instructions:

9. * * * But you are further instructed that, where a person becomes intoxicated from the drinking of alcoholic liquors, or by the use of drugs or other narcotics is rendered

devoid of reason or understanding, and such person has been induced to take such liquors, drugs, or narcotics by the fraud or artifice of some other person, then in such event it would not be voluntary intoxication in the eyes of the law.

By "fraud or artifice," as here used, is meant some scheme or device by which the person is misled or imposed upon, and is induced to take said liquor or drugs without knowing that he is taking it, or without knowing its ingredients. But even though you may find the alcoholic liquor was furnished by other persons and offered to defendant, if he drank the same without being misled as to its contents, and thereby became intoxicated, then under the law his intoxication would be deemed voluntary, and would afford no defense to a crime committed while in such condition.

\*     \*     \*     \*     \*     \*     \*     \*

13. You are further instructed that, should you find, or even have a reasonable doubt thereon, that the defendant, at the time of the killing, was intoxicated, or that his mind was bereft of reason by the recent use of some drug or narcotic, but that his intoxication or aforesaid mental condition had been produced by the artifice or fraud of the deceased or other persons, and should you further find, or have a reasonable doubt thereon, that said intoxication or said mental condition brought about by the use of drugs or narcotics administered as aforesaid, was to such an extent as to absolutely destroy the reason of the defendant for the time being, as far as his knowledge of his acts is concerned, that is, placed the defendant in such mental condition that he had no knowledge of the nature or character of his acts, and was not able to discern and know whether the same was right or wrong, and adhere to the right and avoid the wrong, then in such event, if the defendant stabbed and killed the deceased, you should acquit him.  \*   \*   \*

Upon the question of reasonable doubt, the court instructed the jury as follows:

15. If, from the evidence, you are satisfied beyond a reasonable doubt that the defendant is guilty of murder or manslaughter in the first degree, but have a reasonable doubt

as to which of said offenses he is guilty of, then you must give him the benefit of the doubt, and not find him guilty of a higher offense than manslaughter in the first degree.

In instruction No. 19, the court defined "reasonable doubt" in part as follows:

By the term "reasonable doubt," however, is not meant a mere misgiving of the imagination, a fanciful conjecture, or a suggestion of sympathy for the defendant, but a reasonable doubt is an actual doubt, arising from the evidence or want of evidence in the case.  *   *   *

If, however, after considering, comparing, and weighing all the evidence in the case, your minds are left in the condition that you cannot say that you feel an abiding conviction to a moral certainty of the defendant's guilt, then you would have a reasonable doubt, and it would be your duty to acquit the defendant.

It is often difficult for a court to understandingly frame a clear, concise definition of reasonable doubt, as applied to the evidence in any particular case. The term "reasonable doubt" is a simple expression that a juror of average intelligence will usually comprehend without defining. Considering the instructions quoted relating to reasonable doubt, in connection with the other instructions touching upon that question, we think that issue was fairly submitted to the jury.

There was a great deal of testimony in this case indicating that the defendant was not so voluntarily (or involuntarily) intoxicated as to destroy his sense of right and wrong. For some time the defendant had been engaged in this card game in such a way as to indicate that his mentality was not greatly impaired by the use of intoxicants, and that question was fairly submitted to the jury, and their finding will not be disturbed.

The judgment of the trial court is affirmed.

DOYLE, P. J., and MATSON, J., concur.