## W. F. (DINK) MYERS v. STATE.

No. -A-10631.    Nov. 13, 1946.

(174 P. 2d 395.)

D. S. McDonald, Jr., of Durant, for plaintiff in error.

Mac Q. Williamson, Atty Gen., Sam H. Lattimore, Asst. Atty. Gen., and Victor C. Phillips, Co. Atty. of Bryan County, of Durant, for defendant in error.

BAREFOOT, J. Defendant, W. F. (Dink) Myers, was charged in the district court of Bryan county with the crime of murder. He was tried, found guilty, and his punishment assessed at life imprisonment in the State Penitentiary, and he has appealed.

Defendant is now confined in the penitentiary, and on motion of his counsel, his case has been advanced. Defendant, by reason of poverty, being unable to pay the expenses of an appeal, and having made application in this court for an order requiring Bryan county to pay the expenses of a case-made, the application was granted on May 11, 1945, and the case-made with petition in error attached was duly filed.

Defendant being unable to employ counsel, the trial court, at the suggestion of the defendant, appointed the Honorable D. S. McDonald, Jr., of the Bryan county bar, to defend him. He tried the case in an excellent manner, without compensation, and has prepared the appeal in proper form and briefed and orally argued the case in this court. We commend him for the services rendered in this case, as a member of the bar of this state.

For a reversal of this case, it is contended:

"The state's evidence and uncontradicted testimony precluded a conviction for murder.

"The instructions given, as excepted to by defendant, were not warranted under the facts and did not recognize the uncontradicted facts and the instructions refused should have been given in substance or effect.

"Improper prejudicial questioning was permitted and juror was not excused for proper cause."

The first proposition requires a short statement of the evidence as revealed by the record.

Defendant was charged with the crime of having murdered George Myers, who was his brother, in the city of Durant, Bryan county, on August 2, 1944, by shooting him with a certain U. S. Springfield Rifle containing a 45-60 caliber shell. The killing occurred at the home of deceased and while he was lying on a mattress on the floor in a room occupied also by his son and another party. The shot was fired from the outside of the house, and entered the room below the window facing, and struck the head of the bed, and was deflected and struck the body of deceased. He was taken to a hospital in an ambulance by his son and the undertaker, and died from the effect of the wound received soon after reaching the hospital.

Defendant was what is commonly known as a "dope fiend," and was seen to take some kind of a tablet prior to the killing. The chief of police of the city of Durant testified that the defendant had been picked up "for being too drunk" 40 or 50 times in the past two years. Another son of deceased, who had returned from the armed services for the trial, testified for the defendant, and stated that his uncle had been on dope and whisky for the past seven or eight years.

It is contended by defendant that he could not have been guilty of murder for the reason that at the time of the killing his mental condition was such by reason of the taking of drugs (barbiturates) that he was incapable of forming a premeditated design to effect death.

The record reveals that the defendant lived alone in a trailer house a block or two from the home of the deceased. At the time of the killing Oscar Coffee was staying with

defendant. Deceased lived alone, but on the night of the homicide his son Lee M. Myers, who lived in California, was at home on a visit; and a young woman by the name of Lucile Morgan, who was engaged to marry another son of deceased, and her small child, were also there.

On the morning of the homicide, defendant was in the town of Durant. He made an attempt to secure two different parties to go on his note so he could borrow money. Both refused, and he cursed and abused them, and said to one of them: "My brother George (the deceased), the God-damned son of a bitch, I tried to get him to sign my note and he wouldn't do it. I think I will go home and get my rifle and shoot the damn son of a bitch between the eyes." After being refused by the second party, he said, "There is my brother, he woudn't go my note, and I think I will go home and get my gun and shoot him."

The record shows that the defendant spent some time at the home of the deceased during the day preceding the killing. On the night of the killing, defendant and Oscar Coffee went to the home of deceased, and the defendant called his brother to come out, but this he refused to do. Lee M. Myers, son of deceased, went outside and told defendant that his father did not want to talk with him, and did not want to have anything to do with him. He asked defendant what he wanted, and defendant told him he had an ice pick he wanted to give his brother. Lee M. Myers offered to take the ice pick in for him, but defendant insisted on delivering it in person. He entered the room and was sitting by deceased on the bed. The witness Lee M. Myers testified:

"When I came back he was sitting on the bed talking to daddy and in some way they had gotten into an argument and dispute and he was going to draw this ice pick on

daddy and daddy jumped up and put his clothes on and took the ice pick and daddy didn't want to have him arrested and told him to go on home and get away from there. And he wouldn't go and daddy told him to go on and he stumbled out of the door and got—one word brought on another and he drew a knife on daddy and daddy pushed him out the door and locked the screen door. Q. Did you hear the defendant make any remark when your father put him out the door? A. After daddy put him on the porch he allowed he would come back and kill 'all of you sons of bitches.' That is what he said."

Defendant returned to the street where Oscar Coffee who had come with him had been waiting, and they returned to the home of defendant. The testimony, of the witness Oscar Coffee was:

"Dink (the defendant) asked me to walk in front of him and show him the way. He can't see very good and I did and when we got up there he went to his trailer house and went in and I thought he was fixing his bed and I stopped to get some water and I looked around and he come to the door with a gun and said to me, 'don't you see anything,' and I said 'OK,' and he didn't answer and I said, 'Where are you going.' and he said, 'I am going to go and kill that dirty * * *.' And I said, 'Don't do that Dink,' and he said, 'Shut your mouth and wait until I come back,' and when he left I took off."

This witness immediately went to a neighbor's house to call the officers. On his way he heard a shot fired from the direction defendant had gone, and where the deceased George Myers lived.

The deceased and his son Lee M. Myers and Mrs. Moran had all retired after defendant left, and the lights had been turned out. They were fearful that defendant would return. The deceased and his son Lee M. Myers were lying on a mattress on the floor, and Mrs. Morgan and her baby

were on the bed. All were in the same room. The testimony of Lee M. Myers was:

Q. Tell the jury what happened and explain it fully to them. A. Well, we was laying there talking about him wondering if he would come back, and daddy said, 'No, I don't believe he will. He is drunk;' and said 'I will see him in the morning and he will be all right,' and we was just lying there talking and directly I said, 'He might come back,' and daddy said, 'Well, he might come back at that,' and said, 'in case he does, I will tell you what we will do,' and said, 'he will come up and knock on the door and you open the screen door and when he comes in I will grab him.' And— By Mr. McDonald: Objected to— By the Court: Sustained. Q. Tell what happened there. A. And daddy said, 'We'll—' and that is as much as he got out and the gun fired and I don't know hardly what happened after that. Q. Did your father get up? A. No, sir. Q. Did you know your father was hit? A. Not for a second. As soon as the gun fired, I jumped up and run in the other room. Q. Did you come back? A. I grabbed the gun off the wall and started back and daddy said, 'Son, don't come in here, he has killed me and he will kill you too—' Mr. McDonald: Objected to, if the court please. By the Court: Overruled. Mr. McDonald: Exception. A.—that was the last thing that daddy said, 'Son, don't come in here, he will kill you too. He is after the whole bunch;' and I run back in the other room to see if I could see him and by that time I hollered for help for somebody to call the police—call the police and the ambulance and the ambulance came and we took off to the hospital. Q. Did you go with your father to the hospital? A. Yes, sir. Q. On the road to the hospital did you hear your father make any statement? A. Yes, sir. By Mr. McDonald: We object for the same reasons heretofore stated. By the Court: Overruled. Mr. McDonald: Exception. A. Well, he said he knew that Dink done it and said—he kept complaining about his wind—losing his breath and couldn't hardly breathe at all and was suffering and taking on. Q. Did he say whether he was going to die? A. He said he was going to die, and said, 'I'm all

done for.' We got there at 12 o'clock and he died at 12.30. Q. You don't know the exact time that the shot was fired? A. It must have been about 11.45."

The shot fired into the house disturbed many of the neighbors, and the defendant was recognized by several different parties as he left the premises. They were able to do this by reason of the electric lights in the street, and the bright moonlight night. Defendant was seen by one of these parties standing at the window of deceased's home just after the shot was fired. All saw the gun in his hand. As he passed one of the houses he was seen by a witness and his wife to throw something into the weeds, and the officers found a number of gun shells, and a large butcher knife which defendant had thrown away. He had also attempted to hide his gun in the weeds, but it was found by the officers, and had one empty shell in the barrel. Defendant, when taken to jail, denied to the officers that he had a gun. While in jail he attempted to get the witness Oscar Coffee, who was also in jail, to testify that he (Coffee) was at home in bed at the time of the shooting.

The above statement certainly refutes any contention that the evidence is insufficient to sustain the judgment and sentence.

Counsel for defendant in his brief recognizes the rule of law often announced by this court with reference to the defense of voluntary or involuntary intoxication in murder cases, and the plea of insanity as a result thereof. Adair v. State, 6 Okla. Cr. 284, 118 P. 416, 44 L. R. A., N. S., 119; Collier v. State, 17 Okla. Cr. 139, 186 P. 963, 12 A. L. R. 839; Choate v. State, 19 Okla. Cr. 169, 197 P. 1060, 1061; Cheadle v. State, 11 Okla. Cr. 566, 149 P. 919, L. R. A. 1915 E. 1031; Tubby v. State, 15 Okla. Cr. 496, 178 P. 491; Per-

ryman v. State, 12 Okla. Cr. 500, 159 P. 937; Sweet v. State, 68 Okla. Cr. 44, 95 P. 2d 242.

The early case of Collier v. State, supra, announces the rule that has always been followed by this court with reference to introduction of evidence, its determination by the jury, and the instructions of the court. The syllabus reads:

"1. In a prosecution for murder, alcoholic insanity, or mental incapacity produced by voluntary intoxication existing only temporarily at the time of the homicide, is no justification or excuse therefor. To constitute insanity, caused by intoxication, a defense in a trial for murder, it must be insanity caused by chronic alcoholism, and not a mere temporary mental condition.

"2 Insanity, though superinduced by excessive and long-continued indulgence in alcoholic liquors and known as 'delirium tremens,' or 'mania a potu,' renders a person so afflicted irresponsible for his acts, if it be of such a character as to deprive him of the mental capacity to distinguish between right and wrong, as applied to the particular act, whether he be under the influence of liquor at the time of the commission of the act or not; but, to do so, his affliction must be settled or fixed insanity, not a mere fit of drunkenness. A person, not previously laboring under such a disease or affliction, who voluntarily becomes intoxicated to such an intent and for such a period of time as to cause unconsciousness of his acts, is not irresponsible under the law for the acts done by him while in such mental condition.

"3 Under Okla. Penal Code section 2313, Rev. Laws 1910, (Tit. 21 O. S. 1941 § 701,) homicide is murder 'when perpetrated without authority of law and with a premeditated design to effect the death of the person killed, or of any other human being,' and evidence of intoxication is admissible to show an absence of the premeditated design to kill, for the purpose of determining whether the offense

was murder or manslaughter, and a state of intoxication which will reduce homicide from murder to manslaughter in the first degree must be of such character and extent as to render the defendant incapable of entertaining or forming a design to effect death. And this question is for the jury to determine.

"4. Intoxication, either voluntary or involuntary, is to be considered by the jury in a prosecution for murder in which a premeditated design to effect death is essential, with reference to its effect upon the ability of the defendant at the time to form and entertain such a design, not because, per se, it either excuses or mitigates the crime, but because, in connection with other facts, an absence of malice or premeditation may appear."

It may be stated that the courts, in so far as voluntary intoxication is concerned, have drawn no distinction between one being intoxicated by reason of the consumption of alcohol or intoxicating liquor, or narcotic drugs.

It is contended by defendant that the rule of law as heretofore announced which permits the jury to pass upon the question of temporary insanity after hearing the evidence should be changed and the court should consider this matter as a question of law; that the question of whether the defendant knew "right from wrong", was a question of law and should be determined by the court, and not by the jury. Counsel in his brief says:

"The same principles which have carried our criterion of guilt or innocence for centuries are creaking with venerable age and seeking assistance at the hands of an enlightened court which stands in full view of modern scientific advance. We have here a man whose mental processes have been so deranged that he has killed his own brother. Could any case better serve as a vehicle for transporting onward that principle which science has long since recognized, but with which the courts have been unwilling to stand in accord that a man may be clever, know right from

wrong and yet be insane according to the most violent principles covering insanity. From the most clever minds known to man have come thoughts controlled by insane minds, but this argument is used by those who would retard future progress. This Honorable Court in this case has an opportunity to say that when such circumstances exist and are produced in an undeniable form by the very prosecuting witnesses, defendant under such circumstances cannot be found guilty of murder."

No authority is cited for this position. Nor do we think that any can be produced. We do not deem it advisable to overturn the judicial decisions of this state and of the Nation and announce such a new doctrine. The facts as above stated would not justify its application in the instant case. While the evidence revealed that defendant was a user of some kind of dope and had been for several years, it also reveals a clear premeditated design on the part of the defendant to take the life of deceased. It is true that it was his own brother, but the statements he had made in the presence of others on the morning of the homicide when attempting to have them sign his note, that he intended to get his gun and kill deceased, because he had refused to sign his note; his securing his gun just prior to the homicide and stating that he was going to kill his brother; his attempt to hide the gun, the knife and the shells immediately following the killing was all strong evidence that he not only was acting with a premeditated design to commit murder, but that he knew what he was doing, and that he knew it was "wrong."

The fact that he stood under the lights in the streets, and apparently made no attempt to prevent his identification, is not considered proof of even temporary insanity. It was so light by reason of the moon and the electric lights that he would have had a difficult time in preventing being recognized even if he had tried to do so.

We have carefully examined the instructions given by the court, and they are full and complete. The question of temporary insanity by reason of voluntary and involuntary intoxication, or by the use of drugs, was presented to the jury in strict conformity to the law, as announced by the former decisions of this court. It therefore becomes unnecessary to discuss these instructions at length. The thought expressed in the requested instructions was included in the general instructions, and we find nothing in the refusal of the requested instructions that would justify a reversal of this case.

We have carefully examined the record with reference to the disqualification of the prospective juror, C. L. Morgan. There is nothing to show that this juror was disqualified or that the defendant would in any way be prejudiced by his sitting on the jury. In fact, the record does not reveal that he was a member of the jury, but it does show that defendant had another challenge left at the time he was interrogated, and he could have been challenged.

An examination of this record does not reveal any reversible error, and we find no reason for a modification of the judgment and sentence rendered by the trial court.

For the reasons above stated, the judgment and sentence of the district court of Bryan county is affirmed.

JONES, P. J., concurs.   DOYLE, J., not participating.