D. L. JONES, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–80–509.

Court of Criminal Appeals of Oklahoma.

July 26, 1982.

Rehearing Denied Sept. 10, 1982.

Mitchell A. Lee, Stipe, Gossett, Stipe, Harper & Estes, Oklahoma City, for appellant.

Jan Eric Cartwright, Atty. Gen., Robert W. Cole, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

CORNISH, Judge:

The appellant, D. L. Jones, was convicted of Murder in the First Degree and received the death penalty. He was also found guilty on two counts of Assault and Battery with a Deadly Weapon and was sentenced to twenty years' imprisonment, and twelve years' imprisonment, respectively.

In the guilt phase of the trial proceedings the appellant raises two interrelated propositions of error. Jones argues that his defense of insanity and his defense of unconsciousness, as a matter of law, require acquittal. He also contends that the application of the M'Naghten rule for insanity violates the due process clause of the United States and Oklahoma Constitutions.

On March 14, 1979, Jones was drinking at the Wichita Lounge in Lawton, Oklahoma. While he was seated at the bar, the barmaid noticed a pistol protruding from his boot. She asked Jones to cover the pistol with his

pant leg. Jones told her to shut her mouth or he would blow her head off. Seconds later, the appellant, for no apparent reason, pulled the pistol from his boot and shot a woman who had accompanied him to the bar. After shooting his female companion, Jones turned around to Stanley Buck, Sr. and his son, Stanley Buck, Jr., and asked them, "What the hell are you doing in here?" Jones proceeded to shoot Stanley Buck, Jr. He then turned to Stanley Buck, Sr. and shot him twice in the head at point blank range.

Realizing that Stanley Buck, Jr. was still alive, Jones vowed, "Now I'm going to get you." He further stated, "If I let you live, you'll tell the cops, won't you?" At this point Jones shot Stanley Buck, Jr. again. As one lay dead and two others critically wounded, Jones proclaimed, "I've killed every son-of-a-bitch in here, I guess I'll get me a beer."

The appellant's shooting spree resulted in the death of Stanley Buck, Sr. Jones' female companion was critically injured, requiring the removal of her spleen. Stanley Buck, Jr., spent three weeks in intensive care and is paralyzed on his left side. He was also given a tracheotomy to save his life.

Jones testified that on the day of the murder he had probably taken a prescribed drug, Ativan, in combination with alcohol. He attempted to prove that the interaction between the medication and the alcohol rendered him unconscious of his acts. Jones concludes that the trial court should have directed a verdict on a lesser charge or directed an acquittal, since he introduced evidence of being unconscious at the time of the crime.

## DEFENSE OF INSANITY

The appellant's apparent reliance upon an insanity defense is misplaced. Jones in essence argues that the voluntary ingestion of drugs and alcohol, resulting in temporary insanity, standing alone, should provide a complete defense and thus negate criminal responsibility. Oklahoma follows the M'Naghten test of legal insanity. 21 O.S. 1981, § 152; *Garrett v. State*, 586 P.2d 754 (Okl.Cr.1978). The defendant must demonstrate at trial that during the commission of the crime he was suffering from a mental disease or defect rendering him unable to differentiate between right and wrong, or unable to understand the nature and consequences of his acts.

■ It has long been the rule in this jurisdiction that voluntary intoxication, resulting in temporary mania, does not constitute a mental defect or disease required for a valid insanity defense. *Cheadle v. State*, 11 Okl.Cr. 566, 149 P. 919 (1915). To constitute legal insanity, caused by intoxication, the mental disease must result from chronic alcoholism; not merely a temporary mental condition. *Cheadle*, supra; *See also, Mott v. State*, 94 Okl.Cr. 145, 232 P.2d 166 (1951). Insanity, induced through long periods of excessive alcohol or drug consumption resulting in a continuing mental disease or defect may render a person irresponsible for his conduct, if he is deprived of the mental capacity to distinguish between right and wrong. *Myers v. State*, 83 Okl.Cr. 177, 174 P.2d 395 (1946).

Title 21, Section 153 of the Oklahoma Statutes provides that "[n]o act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition." 21 O.S.1981, § 153. This principle is premised upon the public policy that one who voluntarily consumes alcohol or narcotics should not be relieved from all criminal responsibility merely because the chemical impaired his mental capacity. The voluntary use of intoxicants has been found to be a significant factor in the increase in crime, resulting in an increased danger to the safety and welfare of our citizens.[1]

1. See Dr. Samuel B. Guze, et al. "Psychiatric Disorders and Criminality," *Journal of the American Medical Association*, Vol. 227, No. 6, p. 641 (Feb. 1974). This article concluded that sociopathy, alcoholism, and drug dependence are the principle psychiatric disorders associated with serious crime.

In *Couch v. State*, 375 P.2d 978 (Okl.Cr.1962), this Court applied the law of voluntary intoxication where narcotics are used as the intoxicating medium. In *Couch*, this Court held that where drugs are voluntarily taken, the law of voluntary intoxication shall apply. The *Couch* Court quoted *People v. Lim Dum Dong*, 26 Cal. App.2d 135, 78 P.2d 1026, 1028 (1938), which articulated the public policy considerations underlying the limited intoxication defense. The California Appeals Court stated:

' "There is, in truth, no injustice in holding a person responsible for his acts committed in a state of voluntary intoxication. It is a duty which every one owes to his fellow men, and to society, to say nothing of more solemn obligations, to preserve, so far as lies in his power, the inestimable gift of reason. If it is perverted or destroyed by fixed disease, though brought on by his own vices, the law holds him not accountable, but if, by a voluntary act, he temporarily casts off the restraints of reason and conscience, no wrong is done him if he is considered answerable for any injury which, in that state, he may do to others or to society," * * * "It must be 'settled insanity', and not merely a temporary mental condition * * * " ' which will relieve one of the responsibility of his criminal act.

See also *Gibson v. State*, 501 P.2d 891 (Okl. Cr.1972); *Myers v. State*, 83 Okl.Cr.App. 177, 174 P.2d 395 (1948). In this case, Jones voluntarily mixed alcohol with prescribed medication. This places his conduct within the area of voluntary intoxication.

Therefore, in the area of voluntary intoxication we find that our statutes are controlling. The Oklahoma legislature has determined that voluntary intoxication should not completely relieve one of criminal responsibility. Any change in this public policy statement must come from that branch of government and not from the judiciary.

The settled rule in this jurisdiction is that while voluntary intoxication is not a complete defense to criminal culpability, it may be considered in determining whether the accused possessed the requisite criminal intent during the commission of the crime. In *Miller v. State*, 567 P.2d 105 (Okl.Cr. 1977), we stated:

"[i]ntoxication would not excuse or mitigate crime unless accused had been so intoxicated that his mental powers had been overcome and it had therefore been impossible for him to form criminal intent. This question of intoxication to the point where the accused is unable to form the requisite intent is a question for the jury on proper instructions from the bench."

See also *Johnson v. State*, 621 P.2d 1162 (Okl.Cr.1980); *Biggerstaff v. State*, 491 P.2d 345 (Okl.Cr.1971); *Copperfield v. State*, 37 Okl.Cr. 11, 255 P. 590 (1927); *Beshirs v. State*, 14 Okl.Cr. 578, 174 P. 577 (1918).

Stated simply, voluntary intoxication is no defense to a crime, except to the extent that the intoxication rendered the defendant incapable of forming the necessary mental element. To constitute insanity, caused by intoxication, whether alcohol or drug induced, it must be caused from prolonged use of the intoxicant resulting in a fixed state of mental disease or defect; not merely a temporary mental condition existing during commission of the crime. The determination as to whether the prolonged use of the intoxicant has caused a fixed mental disorder is a question of fact for the jury.

A review of the trial transcript reveals that the appellant did not introduce sufficient evidence to raise a reasonable doubt as to whether he was suffering from a mental disorder due to prolonged alcohol or drug use. In support of his insanity defense he called two psychiatrists, Dr. Charles Beck, and Dr. Lawrence Wharton, who specializes in alcohol and drug addiction problems.

Dr. Beck testified that he had examined the appellant for two hours on October 8, 1978. Dr. Beck conducted several psychological tests with Jones. The Minnesota Multiphasic Personality Inventory disclosed

Jones to be dissatisfied, depressed, discouraged, withdrawn, and worried. This test also suggested he experienced some anxiety, obsessive and compulsive traits. Dr. Beck also administered the Cognitive Capacity Screening test which evaluates whether any brain damage or toxicity is present. Jones scored twenty-eight out of thirty, clearly indicating a lack of organic brain syndrome.

Dr. Beck diagnosed Jones as a borderline schizophrenic. He stated that the interrelationship between the medication, Ativan, and the alcohol could have produced a psychosis causing Jones not to understand the wrongfulness of his conduct. Dr. Beck concluded that due to the alcohol and drugs there was a "reasonable medical inference" that Jones did not know right from wrong at the time of the homicide. On cross-examination Dr. Beck candidly admitted that although combinations of alcohol and drugs have been known to induce a schizophrenic state, in this particular case it may or may not have produced such a mental state.

Dr. Wharton described his impressive background in the field of alcohol and drug abuse. He testified that the combination of alcohol and Ativan (Lorazapam) would cause a sedative effect. He further stated that the combination can cause a psychotic reaction. However, he explained this psychotic reaction is "totally unpredictable . . . in any given individual." Dr. Wharton testified he had never personally examined Jones nor had he ever met him.

Dr. Wharton explained that any person who uses sedative drugs with alcohol is subject to blackout spells. Whether any one person will experience blackouts depends upon the amount of rest he has had, how long since he has eaten, his physical characteristics, his metabolism and various other factors. He stated that these blackouts are the result of toxic organic brain syndrome induced by drugs. Further, a person experiencing such a blackout would be unable to differentiate between right and wrong.

Jones testified on his own behalf. He related that he had experienced mental health problems early in life. At age fourteen he was attacked by a homosexual. In 1973, at age thirty-three, he consulted a social worker about his mental problems. In 1975 he underwent a successful prosthesis operation to remedy his impotency problem. In 1978 Jones went to his family doctor because he had been experiencing headaches. His doctor prescribed Ativan, which alleviated the headaches. Jones stated that he did not remember anything about the events which took place in the Wichita Lounge.

On cross-examination Jones testified that he had been drinking heavily since he was twenty-one. However, he further testified that by August 1979 his drinking problem was under control. On the afternoon in question Jones had consumed two drinks of whiskey and at least one beer. He stated that he was not even sure whether he had taken Ativan on the day of the shooting, however, he probably did. Jones related that he had consumed alcohol and Ativan on several prior occasions and admitted to having voluntarily taken the alcohol and Ativan on August 14, 1979.

■ To the extent the appellant produced evidence that he was suffering from a fixed mental disorder, irrespective of the consumption of alcohol and drugs, the trial court properly instructed the jury on the defense of legal insanity. However, this Court finds that the State introduced sufficient evidence in rebuttal to support the jury's finding that Jones was capable of distinguishing between right and wrong during the commission of the crime.

On rebuttal, the State introduced testimony of four expert witnesses. First, Esther Blevin, a psychologist, testified that she administered a full battery of psychological tests to Jones in August, 1979. Ms. Blevins is employed with the alcohol and drug abuse program at Western State Hospital. She stated that her test results conformed with Dr. Beck's showing Jones to be obsessive, insecure, compulsive, anxious and a ruminating individual. Blevins concluded however, based upon the appellant's conduct, both physical and verbal, as described

by the witnesses and the victims present at the crime scene, it was her opinion that he was aware of what he was doing during the crime. However, she declined to give an opinion as to whether the appellant knew the consequences of his acts in the Wichita Lounge.

Dr. Sambojon, a psychiatrist, examined the appellant for possible mental disorders. Dr. Sambojan testified that it was extremely difficult to psychologically examine Jones because he refused to answer most of his questions. His diagnosis revealed that Jones showed no symptoms of schizophrenia.

Also, on rebuttal, Dr. Scroggin, a doctor of internal medicine, testified that over a three-year period he treated many persons suffering from chronic effects of alcohol which produced organic brain disease. He stated that from his experience a person generally will not "blackout" from the use of Ativan and alcohol unless there is an excessive use of alcohol.

Dr. Scroggins stated that even if Jones did blackout, it was very unlikely that such a blackout would continue for six hours, as the appellant testified. He further concluded that two drinks of whiskey and one glass of beer combined with Ativan would not likely cause someone to blackout.

Lastly, Dr. Orr, a neurologist, testified about the effects alcohol and drugs have on the nervous system. She related that Ativan (Lorazepam) initially and primarily acts upon the ascending reticular activating system of the brain, which keeps us awake. Dr. Orr further stated that our memory is located in another part of the brain called the limbic system. She concluded that if Jones combined alcohol and Ativan, he would have acted sleepy and his speech would have been slurred. She concluded that merely three alcoholic drinks combined with Ativan would probably not affect his memory, refuting Jones' testimony that he could not remember anything that happened during the six-hour time period.

During the State's case in chief, testimony of fourteen lay persons was introduced. These witnesses primarily testified as to Jones' behavior on the day of the homicide, and his conduct and statements subsequent to the shootings. This testimony revealed that the appellant's statements were coherent and he appeared to have full control over his actions. The testimony tended to establish that during the entire episode, he remained calm and mentally capable of understanding the nature of his acts and was aware of their wrongfulness.

Further, the appellant admitted driving home without any mishap, minutes after the shooting. The witnesses also testified that Jones did not appear to be under the influence of alcohol or drugs during the commission of the crime. Evidence was also introduced as to specific statements made by Jones which tended to show he was cognizant of his conduct. Jones made the following statements:

1. "Shut your mouth or I'll blow your head off."

2. "If I let you live, you'll tell the cops, won't you?"

3. "I come down here to kill every son-of-a-bitch in here."

4. "I've killed every son-of-a-bitch in here, I guess I'll get me a beer."

 We are of the opinion that the State presented sufficient evidence to rebut the appellant's insanity defense. It is the function of the jury to determine the weight and credibility of both lay and expert witnesses in light of the particular events surrounding the criminal episode. The jury's determination on the sanity issue will not be disturbed on appeal where there is sufficient evidence to support its finding. Reviewing the record, we find as a matter of law the evidence was sufficient for the jury to conclude Jones was sane during the commission of the offense. See *West v. State*, 617 P.2d 1362 (Okl.Cr.1980).

## DEFENSE OF UNCONSCIOUSNESS

 The appellant also asserts that, as a matter of law, he established the defense of unconsciousness (automatism). Again, we note that the voluntary consumption of alcohol and drugs is only admissible

**1258** ■　■

to show an absence of a premeditated design to kill. Therefore, intoxication can reduce the homicide from murder in the first degree to manslaughter in the first degree, provided the intoxication rendered Jones incapable of forming a deliberate intent to effect death. *Myers v. State,* supra; see also *Oxendine v. State,* 335 P.2d 940 (Okl.Cr.1958). It follows that where the defendant's unconsciousness results from the voluntary consumption of alcohol or drugs the defense of unconsciousness (automatism) as a complete defense is not available.

■　The defense of unconsciousness applies to situations where the defendant's otherwise criminal conduct results from an involuntary act totally beyond the control and knowledge of the defendant. The defense is not the same as insanity. *Carter v. State,* 376 P.2d 351 (Okl.Cr.1962). To invoke an unconsciousness defense the defendant is not required to present evidence of a mental disease or defect.

■　In this case, even if Jones was rendered into a state of unconsciousness during the crime, the evidence is clear that the mental state was induced through the voluntary consumption of alcohol and drugs. Thus, Jones' mental state was not totally beyond his mental or physical control. Furthermore, Jones testified that he was informed at Alcoholics Anonymous meetings about the dangers of taking sedative drugs. Consequently, he was knowledgeable of the risks involved with combining alcohol and drugs. We hold that Jones did not present sufficient evidence to create a reasonable doubt that he was unconscious, during the homicide, due to circumstances wholly beyond his knowledge and control.

### DEFENSE OF INVOLUNTARY INTOXICATION

■　Involuntary intoxication is a complete defense where the defendant is so intoxicated that he is unable to distinguish between right and wrong, the same standard as applied in an insanity defense. An involuntary intoxication defense is available where the intoxication results from: 1)

fraud, trickery or duress of another; 2) accident or mistake on his own part; 3) a pathological condition; 4) ignorance as to the effects of prescribed medication.

■　The question of whether the defendant's intoxication was involuntary is a fact question for the jury. *Myers v. State,* supra, 174 P.2d at 400. In this case, we find that there was not sufficient evidence to indicate that Jones' intoxication was involuntary. See *Choate v. State,* 19 Okl.Cr. 169, 197 P. 1060 (1921).

### CONSTITUTIONALITY OF THE M'NAGHTEN RULE

The appellant argues that he was denied due process due to the restrictive application of the M'Naghten rule. In *Richardson v. State,* 569 P.2d 1018 (Okl.Cr.1977), this Court was asked to adopt the Model Penal Code's test for insanity. In *Richardson* we refused to abandon the M'Naghten rule as the exclusive test for insanity in Oklahoma.

■　We find that the M'Naghten test of criminal responsibility is constitutional. The "choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy as to the extent to which that knowledge should determine criminal responsibility." *Leland v. Oregon,* 343 U.S. 790, 801, 72 S.Ct. 1002, 1008, 96 L.Ed. 1302 (1952). The state legislature's decision to exculpate only those mentally ill persons who are unable to distinguish between right and wrong is a rational embodiment of a basic tenet of criminal justice that no one should be held criminally responsible for acts which he could not appreciate as wrongful.

In *Leland,* supra, the U. S. Supreme Court in addressing Oregon's use of the M'Naghten rule stated "its procedure does not run foul of the Fourteenth Amendment because another method may seem to our thinking to be fairer or wiser ..." The *Leland* Court further observed that "[t]he science of psychiatry has made tremendous strides since that test was laid down in M'Naghten's Case, but the progress of sci-

ence has not reached a point where its learning would compel us to require the state to eliminate the right and wrong test . . ." supra 343 U.S. at 800–801, 72 S.Ct. at 1008. It has been some thirty years since the Supreme Court addressed the issue, however, we find its reasoning to be equally valid today.[2]

In determining which test of criminal responsibility best satisfied the ends of criminal justice, this Court will give great deference to the policy determination of the legislature. In an area fraught with scientific and medical uncertainties, we find the legislature's enactment of the M'Naghten rule of legal sanity is consonant with the constitutional guarantee of due process of law.

Having found no reversible errors in the first stage of the proceedings we affirm the jury's decision to find Jones guilty of Murder in the First Degree and two counts of Assault and Battery with a Deadly Weapon.

### THE DEATH PENALTY

The appellant concludes that the imposition of the death penalty is excessive as compared to similar cases. It is the duty of this Court to carefully examine the appropriateness of the death penalty. The Oklahoma death penalty statute mandates:

With regard to the sentence, the court shall determine:

1. Whether the sentence of death was imposed under the influence of passion, prejudice, or any arbitrary factor;

2. Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in this act; and

3. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

21 O.S.Supp.1980, § 701.13(C).

In this case, the jury found two statutory aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; and, (2) the defendant knowingly created a great risk of death to more than one person. We find that both aggravating circumstances are supported by the evidence.

In *Eddings v. State*, 616 P.2d 1159 (Okl. Cr.1980); —— U.S. ——, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (reversed on other grounds), this Court defined the words heinous, atrocious, and cruel. We stated that the legislature intended to reach murders that were "out of the ordinary." We further held that "heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others." supra at 1167–68. Here, the appellant's cold and brutal shooting of three innocent persons for no apparent reason or motive is in the eyes of this Court extremely wicked and shockingly evil. The evidence also established that the appellant was wholly indifferent to the pain inflicted upon his victims. The unarmed victim lay wounded and pleaded for his life, yet the appellant coldly and deliberately shot him at point blank range and then continued to mock the victim as he bled to death.

The evidence amply supports the jury's finding that Jones knowingly created a

---

**2.** Our review of the current medical opinions in the field of alcohol and drug use shows that there is still debate as to the medical status and treatment of alcoholism and drug abuse in relation to mental disease. *See* Dr. Jerome Carroll, *"Mental Illness" and "Disease?"; Outmoded Concepts in Alcohol and Drug Rehabilitation,* Community Mental Health Journal, vol. 11(4), p. 418 (1975); Dr. Mogens Ellermann, *Social and Clinical Features of Chronic Alcoholism,* Journal of Nervous and Mental Disease, Vol. 107, p. 556 (1948); Dr. William T. Hart, *Treatment of Alcoholism in a Comprehensive Community Mental Health Center,* American Jour-

nal of Psychiatry, Vol. 126, No. 9, p. 109 (1970); Dr. Harris E. Hill, *The Social Deviant and Initial Addiction to Narcotics and Alcohol,* National Institute on Drug Abuse Research Monograph Series, p. 90 (March 1980). Henri Begleiter, *Brain Dysfunction and Alcoholism: Problems and Prospects,* Alcoholism: Clinical and Experimental Research, Vol. 5, No. 2, p. 264 (Spring 1981); Dr. William B. Terhune, *A Method of Treatment of Alcoholism and the Results,* Journal of Kentucky Medical Association (March 1956); E. M. Jellinek, *The Disease Concept of Alcoholism,* 246 (1972).

great risk of death to more than one person. Not only did he shoot and kill Stanley Buck, Sr., but he shot and seriously wounded two other persons, one of whom was a close friend who had accompanied him to the bar. Both were shot at close range, causing serious injuries. Additionally, Jones made it clear, prior to shooting Stanley Buck, Jr., that he intended to kill him.

In mitigation of the death penalty, the appellant introduced the evidence of his good character. Jones does not have any prior criminal record. He is forty-one years old, married and has four children. Further he was diagnosed as a latent schizophrenic and was under stress at the time of the criminal conduct.

 It is the duty of the jury to weigh the aggravating circumstances against the mitigating circumstances in determining whether to impose the death penalty. Here, there is sufficient evidence to sustain the jury's finding that the aggravating circumstances outweighed the mitigating circumstances. Therefore, the crucial issue before this Court is whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases.

When comparing the death sentence with factually similar cases this Court will generally limit our review to those cases decided under the present death penalty statute. In *Eddings v. State*, supra this Court commented:

> An attempt has been made to compare this case with prior cases that were tried and reviewed under death penalty statutes that are definitionally different from the current statutes. Hence, we find those cases provide no basis for meaningful sentence review.

However, this Court presently finds it necessary to cautiously examine earlier first degree murder cases for guidance as to the appropriateness of the appellant's death sentence, where the cases are factually analogous.

In *Gregg v. Georgia*, 428 U.S. 153, 205, 96 S.Ct. 2909, 2940, 49 L.Ed.2d 859 (1976), the Supreme Court in footnote 56 commented, "The petitioner further complains about the Georgia Court's current practice of using some *pre-Furman* cases in its comparative examination. This practice was necessary at the inception of the new procedure in the absence of any *post-Furman* capital cases available for comparison." The principle underlying the proportionality review is to substantially guarantee that death penalties will be imposed in a consistent manner. Therefore, we will utilize a very limited comparison of *pre-Furman* cases in an attempt to bring some reasonable consistency in death penalty cases.

 In comparing the sentence of death imposed in this case, with cases [3] decided under the current death penalty statutes and other factually similar cases,[4] we hold that the sentence of death is not disproportionate or excessive. We further find that the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor.

The sentence of death by lethal drug injection is therefore AFFIRMED.

---

**3.** *Burrows v. State*, 640 P.2d 533 (Okl.Cr.1982) (modified to life); *Franks v. State*, 636 P.2d 361 (Okl.Cr.1981) (modified to life); *Maghe v. State*, 620 P.2d 433 (Okl.Cr.1980) (life); *Hays v. State*, 617 P.2d 223 (Okl.Cr.1980) (aff'd death penalty); *Irvin v. State*, 617 P.2d 588 (Okl.Cr. 1980) (modified to life); *Eddings v. State*, 616 P.2d 1159 (Okl.Cr.1980); —— U.S. ——, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (remanded for resentencing); *Chaney v. State*, 612 P.2d 269

(Okl.Cr.1980) (aff'd death penalty); *Hager v. State*, 612 P.2d 1369 (Okl.Cr.1980) (rev'd on other grounds.)

**4.** *Washington v. State*, 568 P.2d 301 (Okl.Cr. 1977); *Brooks v. State*, 566 P.2d 147 (Okl.Cr. 1977); *Patrick v. State*, 502 P.2d 1289 (Okl.Cr. 1972); *Gibson v. State*, 501 P.2d 891 (Okl.Cr. 1972.)