ROBERT CARGO v. STATE.

No. A-8845. March 22, 1935.
(42 Pac. [2d] 551.)

4

Ralph Keahey, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, P. J.   The plaintiff in error, hereinafter for convenience will be referred to as the defendant, was convicted of the crime of murder and sentenced to death in the electric chair.

The offense is alleged to have been committed the night of March 7, 1934. The deceased, A. L. Luke, resided at Asbury and Main street, in Bethany, Oklahoma county, Okla. On the night of March 7, 1934, C. H. Padgett, who was working for the deceased, went to his home to deliver to him some money he had collected for trees he had sold. The defendant, who had been living in the neighborhood

of Bethany, was there. The night of March 7, 1934, defendant left the locality of Bethany, and was supposed to have gone to Texas to assist in hauling fruit to the markets in Oklahoma City and other places in Oklahoma. The deceased was not seen about his place the next day, and, when his home was entered into, his remains were found. He had been killed by the use of a hatchet, his head being crushed, gashed, and badly |mutilated. The automobile of the deceased was gone, his billfold was found in the house containing no money, his hat in a crushed condition was also found in the room, and the watch and gun of deceased were also missing.

An investigation was made by the officers, and it was learned that defendant was a native of Alabama, was born and reared near the city of Birmingham. The officers got in communication with officers at Birmingham, and defendant was located and arrested. When arrested, he had the car of deceased bearing the same license tag the car of deceased had when taken. After his arrest, he confessed to the officers that he killed the deceased. The county attorney, Mr. Lewis R. Morris, Sheriff Stanley Rogers, and a deputy, Mr. Eads, went to Birmingham and returned the defendant to Oklahoma City. While in Birmingham defendant made a confession telling how he killed the deceased, and stating he took the property of the deceased with him, including the car; that on the road to Alabama—in Memphis—he pawned the watch and gun. As they came through Memphis, they tried to locate the pawnshop, but were unable to do so.

In his confession, among other things, the defendant states:

"Mr. Luke was sitting in a chair when I got there. I got into an argument with him about automobiles; he said

I did not know what I was talking about, and I got about half way mad. He had his back to me and I got the hatchet and hit him somewhere in the head. I don't know how many times I hit him. After I hit him with the hatchet I took 12 or 13 dollars from him, his white gold watch, and his car keys, got his car and drove it to Oklahoma City."

Further on in his conversation he says:

"I got to Birmingham some time before daylight Saturday morning and I went to Ruth Higginbottom's home. I did not tell them anything about how I got the car. The officers arrested me Monday morning, March 23, 1934, and took me to a garage in Trafford, Ala., and we got into the car which they had stored there and I rode to jail in the car. This was the same Chevrolet coupe, 1931 model, that I had stolen from Mr. Luke in Bethany the night of March 7, 1934."

In the trial of the case the officers who went after the defendant testified to his making the statement voluntarily and without any compulsion. The defendant testified he was 20 years of age, and that he was born and reared in Jefferson county, Ala., 15 miles from Birmingham; he had been in Oklahoma about six months prior to the date of the killing; had been living with his brother Fred near Bethany, Okla., where his brother was running a store; he had worked some for the Morgan Dairy, and different other parties; had known Mr. Luke four or five months; had talked with him quite often and had been to his home four or five times.

"I got to his house the night of the killing after dark, about 7 o'clock; went in the front part of the house which was used as an office. I was there with Mr. Luke when Mr. Padgett came. Mr. Padgett stayed just a few minutes. He paid Mr. Luke some money. Mr. Luke had some whisky and asked me if I wanted a drink, and I told him yes, I believed I did. The liquor was in a quart fruit jar. He

brought the liquor to the front room and I took a drink, and Mr. Luke took a drink out of the fruit jar. We got into an argument over automobiles and how much they had improved, and he called me a liar, and said, 'You are just a God damned liar,' and I said I wasn't, and there was a little bookcase standing next to the wall and a hatchet on it, and he attempted to hit me with it. After he struck me here on the hand, there was a 410 shotgun setting just inside the door. I took the hatchet away from Mr. Luke and we had quite a scuffle and turned the desk chair over. When I got the hatchet he started for the shotgun, and said, 'God damn you, I will fix you.' When he started for the shotgun I hit him with the hatchet in the back of the head somewhere and knocked him down. I don't know how many licks I hit him. After I realized what I had done I taken his money and his keys and watch and left. I did not know what else to do. I took the gun with me and threw it into a river somewhere on the road. I spent the night in Oklahoma City and the next morning went on to Alabama."

The defendant called a number of parties to show his actions were that of a mere child and not that of a boy of twenty years of age. The defendant stated deceased was drinking and had whisky in the house, and had him drink whisky before he killed the deceased. The witness Padgett's testimony shows that he smelled no whisky on the breath of deceased when he delivered the money and no evidence of whisky was found at his home when it was searched after the body of the deceased was found.

The confession of the defendant at Birmingham makes no mention of there having been any whisky at the home of the deceased the night of the killing. The foregoing is in substance the testimony introduced at the trial.

The defendant has assigned several errors alleged to have been committed by the trial court sufficient to warrant this court in reversing the case. The first assignment

is the only one that is necessary to be considered by this court, and that is:

"Said court erred in overruling the motion of the plaintiff in error for a new trial."

The motion for a new trial covers all the other assignments, and in the consideration of this case by the court all of the errors in the motion for a new trial will be carefully considered. The defendant discusses the action of the court in overruling his motion for a new trial, and at length argues the question as to an agreement alleged to have been made by the county attorney and the chief counsel for the defendant. In his argument he insists that the agreement between counsel was that the prosecution would not ask for the death penalty, and that by reason of the agreement the defendant waived his right for a continuance at the beginning of the trial. The defendant argues that, by reason of the failure to carry out the agreement alleged to have been made, the defendant was denied a fair and impartial trial because of the irregularities of the alleged agreement, citing in support of his contention Wright v. State, 7 Okla. Cr. 280, 123 Pac. 434, and several other cases. The cases cited by the defendant are not applicable to the facts argued by the defendant, for the reason the record in the case clearly shows that, prior to the commencement of the trial, the defendant made no statement in open court that an agreement had been entered into with the county attorney as to the manner in which the defendant was to be tried. If counsel for the defendant was misled or believed he had any such agreement with the county attorney, this should have been called to the attention of the court. Counsel did not do this, and the record further discloses that in the examination of the jurors, each juror was asked if he

had any conscientious scruples against the infliction of the death penalty, and each juror that answered he had any conscientious scruples against inflicting the death penalty was excused from service. It is clearly shown from the beginning of the trial until its conclusion that the state intended to ask the death penalty.

On the hearing of the motion for a new trial, when the evidence was introduced by both sides as to whether the county attorney had agreed with defendant's chief counsel he would not ask for the death penalty, the county attorney introduced correspondence, in which, among other things, it was stated to Mr. St. John, the chief counsel for the defendant:

"After giving this case considerable thought we have come to the conclusion that the case should have been tried, and therefore we have set it for trial on the 28th day of May. Under the circumstances I do not feel like making a recommendation in this case, as I feel that whatever the judgment and sentence should be imposed should be left to the court or to the jury after being advised of the facts."

Further on the county attorney states:

"On Friday before the case was called for trial Mr. St. John came to my office and talked to me and I advised him my office would not agree to the entering of a plea of guilty in the case and making a recommendation to the court of a life sentence. That I thought it was a case that ought to be tried and left to a jury, and if he wanted to just go down and enter his plea of guilty before the court I would be glad to state the facts but would make no recommendation to the court after the court had heard the facts."

The record clearly shows that the contention of the defendant as to an agreement between the county attorney

and the chief counsel for the defendant is not borne out by the record; therefore the contention of the defendant as to the agreement as to what sentence should be imposed on the defendant is without merit.

It is next urged by the defendant that the court erred in refusing to permit him to introduce testimony to show the regular habits of the deceased, which would have materially affected the outcome of the trial, defendant arguing that deceased was an habitual drunkard, and that, on every occasion he had been to the home of deceased, deceased had furnished him with whisky. This contention of the defendant is without merit, for the reason that, if it was a fact deceased was in the habit of drinking intoxicating liquor, it would not be a legitimate defense to taking deceased's life because the deceased happened to be a man who would take a drink occasionally. The state did not offer to conceal the fact that deceased occasionally took a drink. Considering the testimony of the defendant and the confession made in Alabama, we hold that the defendant was not prejudiced by the court refusing to permit testimony as to the deceased being an habitual drunkard.

The defendant further urged that the court erred in the admission of the testimony on the part of the state in rebuttal with regard to the hat of deceased which was not properly connected with the action of the defendant by the direct testimony of the state, and that the evidence introduced in rebuttal was evidence that should have been introduced in chief. This court has held that, where the court permitted evidence in chief to be introduced in rebuttal, it was not such an error as would require a reversal. Johnson v. State, 21 Okla. Cr. 17, 204 Pac. 311; Claycomb v. State, 22 Okla. Cr. 315, 211 Pac. 429.

The fact that evidence may have been introduced in chief by the state does not prevent its introduction as evidence in rebuttal. The introduction of such evidence is a matter of discretion of the trial court and will not be ground for a reversal unless an abuse of discretion is shown. Seigler v. State, 11 Okla. Cr. 131, 145 Pac. 308, 309; Cochran et al. v. U. S., 14 Okla. 108, 76 Pac. 672.

In admitting the testimony complained of by the defendant, the court did not abuse its discretion.

The defendant further argues that the court erred in failing to grant a new trial or in failing to allow the defendant to show that at least one juror was prejudiced to the detriment of the defendant and that he did not answer truthfully on his voir dire, which was not known to the defendant until after the trial. The record discloses that in selecting the jurors in this case the defendant waived his ninth peremptory challenge, thus showing he was satisfied with the twelve jurors selected, clearly showing that the defendant was not compelled to take an incompetent or prejudiced juror, and the presumption is, in the absence of a contrary showing, that the jury was composed of impartial and qualified jurors, and the defendant cannot be heard to complain if he does not get a competent jury. Coatney v. State, 52 Okla. Cr. 70, 2 Pac. (2d) 604.

The next and only argument necessary to be considered by this court is the assignment that the judgment rendered against this defendant was not sustained by the law and the evidence. An examination of the record shows by the confession and the testimony of the defendant that defendant killed the deceased with a hatchet; the state's testimony shows the head of the deceased had been hacked, cut, and bruised in several places. The confession of the defendant shows he took the life of the deceased, he took

the money of the deceased, watch, gun, and car and left the scene of the slaying without informing any one he had had trouble with the deceased and had probably killed him.

The testimony further shows that the defendant, the day before he killed the deceased, was telling different parties he had arranged to join a truck company and go to Texas and assist in hauling fruit and vegetables to the Oklahoma market and other places, which would account for his absence a sufficient length of time for him to get away before the death of deceased would be discovered, thus indicating and showing he had in mind to rob the deceased and to kill him, if necessary. In his confession at Birmingham, Ala., the deceased makes no mention that he and the deceased were drinking and fails to say anything about the deceased trying to get a gun.

The record on behalf of the state and defendant clearly shows that defendant premeditatively planned the killing. An effort was made on behalf of the defendant to show his mental condition as being that of a child; one good lady testifying the reason she believed it was the defendant enjoyed playing with her ten year old son. The defendant was twenty years of age. All persons having red blood in their veins and cherishing and revering the memory of mother love children and delight in amusing and entertaining them. This act is one of the best evidences of sanity.

We have carefully considered the record in this case, and cannot conceive how a jury could have done other than it did when it returned its verdict of guilty and imposed the death penalty. The record discloses this to be a cold-blooded murder committed for the purpose of robbery. Society will tolerate no such conduct as the defendant was guilty of in this case. We have carefully examined the

record, including the instructions in this case, with the care its importance deserves, and feel that the defendant was accorded a fair trial. The judgment is affirmed.

The original time for the execution having passed, owing to the pendency of this appeal, it is considered, ordered, and adjudged by this court that the judgment and sentence of the district court of Oklahoma county be carried out by the warden of the state penitentiary at McAlester by electrocution of the defendant on Friday, May 24, 1935.

DOYLE, J., concurs. EDWARDS, J., not participating.