# WALKER v. STATE.

No. A-11103.   Feb. 15, 1950.

(214 P. 2d 961.)

2

S. S. Lawrence and Amos T. Hall, both of Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, J. The plaintiff in error, Billy W. M. Walker, defendant below, was charged by information, tried by a jury and convicted of the crime of the murder of Dan Mingo. It was alleged in the information the defendant shot Dan Mingo three times inflicting such bodily wounds on him from which the said Dan Mingo died shortly thereafter. The information alleged the crime was committed in the city of Tulsa, Tulsa county, Okla., near midnight on November 24, 1947. The jury found the defendant guilty, and fixed his punishment at life imprisonment in the penitentiary.

The defendant makes nine assignments of error but makes only two contentions in his brief. First, he contends under the evidence the defendant, if guilty, is only guilty of manslaughter in the first degree. In this connection, we have made a careful review of the testimony. We find it discloses there is a conflict in the evidence offered by the state and the defendant. Only two persons know what took place in the room where the killing occurred. Ruby Mingo, the wife of the deceased at the time, who was 32 years of age, testified that she and Dan Mingo, the decedent, were husband and wife, but had been separated (not divorced) for about three months. During that period of time Dan Mingo had been gone, returning three days before the killing on Monday night. Two months prior to the killing herein involved, Ruby Mingo met the defendant, Billy W. M. Walker, age 21, and had been intimate with him to the point of as many as three acts of sexual intercourse per week. After Dan's

return, he had been back to the home at 524 East King street in Tulsa, and had spent three nights there, in bed with Ruby. The last of these occasions was on Friday, November 21, 1947, before the killing on November 24. It clearly appears from the record that Dan Mingo did not know the defendant. The defendant admits he did not know Dan Mingo. On the day and night in question, about 8 or 9 o'clock a. m., Billy Walker had breakfast with Ruby, her brother, sister and nephew. Billy left and went to a tavern, the Dew Drop Inn, which was operated by Ruby's sister-in-law, Maisie Camp. Ruby later followed him, and together they went to town and bought some things. After some two hours, on the way home they again stopped for 30 minutes at the tavern where they drank some beer. Then Ruby went to her home, where she prepared dinner. About 8 p. m., Billy called her from the tavern and she picked him up in her car and they went back to her house. About 8:30 p. m., Dan Mingo appeared, knocked on the door and was let in at the front door. He came into the kitchen where Ruby, her sister Mary, and her nephew, and Billy Walker were present. Dan said "looks like you all are doing all right". Dan left, and did not return until 11:30 p. m. When he came back, Ruby let him in at the front door. She and Billy Walker were in the living room. She testified Billy Walker was then armed with a .38 caliber pistol in his right hip pocket. She said Dan came in and said "If one of you mother etc., (too vile to print) move, I will blow your heart strings out". She testified she said "Oh, Dan, don't do that. There isn't any need for this, what is the matter with you". She said Dan had his hand in his bosom. She could not see anything in his hand, however. She then said his hand was down in his pants. Billy Walker, she said, was trying to get his hand on the gun in his hip pocket. Suddenly, she said,

Dan came at her real fast and kicked her. She went through the door to the bedroom and closed the door. As she retreated, she said Billy Walker was back of Dan Mingo, and on his feet and coming towards Mingo. Then, she said, she heard three or four shots fired. She further testified she retreated to the bathroom and stayed there until her sister came in. That neither Mingo nor Billy Walker was in the house when she came out of the bathroom. That she next saw Walker when Officer Williams brought him back.

Mason Hickman, a state's witness, testified he lived at 610 East King street, about a block from Ruby Mingo's place. He said he and his wife were awakened about 11:30 by a man calling for help. She said this man said that a man was trying to kill him about his wife. He rushed to the front door and saw a man running and another man behind him about 15 yards who was armed with a pistol. One shot, he said, was fired as they passed his house the first time. He lost sight of them until they returned running in the opposite direction, in front of his house. When they got in front of his house, he said Mingo tripped and fell over a wire that was run to the next door to protect some flowers he had. The defendant, Walker, he testified, said to Mingo "Get up, you son of a bitch", and shot him while he was on the ground. These facts show the killing was premeditated and bring the defendant within the definition of section 701, subsection 1, Title 21 O. S. A. 1941, defining murder as a premediated design to effect the death of the person killed. The killing in this case might have been one based upon the belief of self-defense at the house, but when the defendant pursued the deceased and killed him as the record shows he did, it ceased to be within the realm of self-defense and clearly fell into the classifica-

tion of premeditated murder. Under the provisions of section 703, Title 21 O. S. A. 1941, "a design to effect death sufficient to commit murder may be formed instantly before committing the act by which it is carried into execution." Construing this section this court said, in Basham v. State, 47 Okla. Cr. 204, 287 P. 761, 762:

"A premeditated design to effect death * * * is no more nor less than a mental purpose to take human life, which may be formed instantly preceding the act by which it is carried into execution." Easley v. State, 78 Okla. Cr. 1, 143 P. 2d 166.

We are of the opinion that when Walker chased and shot Mingo when he was down on the ground, it was his mental purpose to take Mingo's life, and constituted premeditated murder.

Counsel for the defendant contends that Hickman's story is improbable, and unworthy of belief. We have carefully examined the same, and find no motive for it save and except to serve the ends of justice. It does not appear to us to be improbable. No doubt, defense counsel's belief as to the improbability of Hickman's story is predicated upon the proposition that they ran in one direction in front of Hickman's house and then returned again running in the opposite direction. That fact alone does not make it improbable. Counsel for the defendant does not go into detail as to why it is improbable. We can only, therefore, surmise it was because of Hickman's testimony to the effect that decedent reversed his field of flight and returned again in front of Hickman's house. There is nothing improbable in that fact. Men, when being chased, often reverse their field and suddenly go in the opposite direction obviously to throw their adversary off balance and take advantage of his surprise. It is done every season in football. This maneuver was not

improbable but more than probable. Hickman did not know either of the parties, and was without motive so far as this record reveals, except his interest in truth and justice. The record discloses that Mingo laid there on Hickman's yard until removed to the hospital.

Immediately after the shooting, officers, who were on their way home and in the immediate vicinity, appeared at the point where the decedent lay. They were about 25 feet from Mingo when Walker came over to their car and told them that he had just shot this man. They said that Mingo told them while he was lying on the front yard, "this man is killing me about my own wife". They searched Mingo and found him to be unarmed, not even with a pocketknife. Further proof offered by the state showed Mingo was shot in the right hand, losing parts of three fingers, shot in the front of the body which went clear through, and once in the back, which bullet was deflected and lodged in the body without entirely passing through the body. Shooting one in the back likewise strips a case of the appearance of self-defense. The record does not show when the back wound occurred. In any event it was while the deceased was in flight and certainly not while making an attack. Mingo died shortly after being taken to the hospital. In substance, this is the evidence upon which the state relied for conviction.

The defendant's evidence was that at the time the crime was committed he had never been married, that he served in the United States Army overseas in World War II, receiving a Purple Heart for wounds received in action, a Good Conduct medal, and an Honorable Discharge. He testified he was not acquainted with Dan Mingo during his lifetime. That it was his information that Mingo and his wife, Ruby, were separated and it was not his intention to break up a home. He said Ruby lived

across the street from him and his invalid father. He identified the gun used in the killing as his father's pistol. He said he took it over to Ruby's house to show it to Houston Hopkins who Walker said had talked to him about buying the pistol (this evidence was positively denied by Hopkins who testified in rebuttal at no time had he ever discussed guns with Walker). Defendant denied, contrary to Ruby's statement, that he was present when Dan Mingo made his first appearance about 8:30 p. m. Further, he testified that Dan Mingo appeared at Ruby's about 11:30 p. m. He said that prior to that, Ruby got a call from her sister-in-law at the tavern warning Ruby that Mingo had just left the tavern, that he was drinking heavily, was awful nervous and that she had better be careful because he was going to do something to her. (In this connection, no attempt was made by the defendant to corroborate this evidence by calling Tony Gillespie, who Ruby testified gave her the information. The record shows she was available and could have corroborated this evidence. The record further shows that no one was called from the tavern to establish that Dan Mingo was there and drinking though such evidence was available.) The defendant's testimony is substantially the same as that of Ruby Mingo's as to the entrance of Dan Mingo, and what he said to Ruby and the defendant when he entered the premises. The defendant testified he was afraid of Dan, from the things he had heard he had done to Ruby. He had his hands in his trousers. He said his coat was unbuttoned and open. (It is worthy of note in this connection that the state's case showed by the location of the bullet holes in the coat, that the deceased's coat was buttoned.) The defendant further said that Mingo came in and rushed Ruby and kicked her. That he got scared and began to reach for his gun believing Mingo was armed. He said when Ruby ran into Mrs.

Kemp's bedroom, he, the defendant, also followed her intending to escape into the kitchen but Mingo cut him off from Mrs. Kemp's bedroom. (Herein appears a discrepancy in his testimony and that of Ruby's. It should be recalled, according to her, that she slammed the door between Mrs. Kemp's bedroom and the living room, leaving the defendant and Mingo therein. Immediately thereafter she said she heard three or four shots from a gun, therefore, according to her story, the shooting occurred in the living room.) The defendant says he slipped the pistol from his pocket and Mingo grabbed it. The first time he pulled the trigger he says it snapped, the next time it fired he shot Mingo loose from the gun. Then he says they started grappling over the bedroom and he, the defendant Walker, started firing. The facts show that there was one bullet in the door facing, between the living room and bedroom, which is proof of the fact that part of the shooting did occur in the living room. The defendant's story as to it having occurred in the bedroom stands unsupported. He says he fired four shots in the house and none other outside the house. Finally, Mingo turned him loose, he said, and ran out of the back door. Shortly thereafter some one ran up on the front porch. The defendant says it scared him, he thought it was Mingo and he said "so I ran out the back door myself". He positively denied he chased the deceased Mingo down the street and shot him while he was on the ground as testified to by state's witness Hickman. To the contrary, he said he came back into the house and waited until some one said the officers were on the corner. So he got his hat and went to the corner, and when he got there he surrendered himself and his gun to the officers.

The foregoing contains a substantial statement of the evidence on behalf of both the state and the defendant.

The weakness of the defense lies in the contradictions between the evidence of Ruby Mingo and the defendant in relation to the killing and the place thereof; and the failure to prove corroboration of either story from persons who could have provided corroboration if the facts had warranted it. The strength of the state's evidence lies in the fact that Mingo was shot in the back and, according to the evidence of Mason Hickman, the defendant chased and shot Mingo while he was down on the ground. No doubt similar observations in relation to the condition of the evidence occurred to the jury. The conflict in the evidence raised an issue for the determination of the jury.

We have repeatedly held that where the evidence is conflicting, and different inferences may be drawn therefrom, it is the province of the jury to weigh the evidence and determine the facts. Furthermore, the Criminal Court of Appeals will not weigh conflicting and contradictory evidence in a case which has been passed on by the jury and reverse the same for insufficiency. Jackson v. State, 84 Okla. Cr. 138, 179 P. 2d 924; Young v. State, 84 Okla. Cr. 71, 179 P. 2d 173; Boulding v. State, 83 Okla. Cr. 352, 177 P. 2d 152; Brown v. State, 81 Okla. Cr. 314, 164 P. 2d 401. Moreover, we have held that before the Criminal Court of Appeals will interfere with a jury's verdict on the ground that the evidence was insufficient to sustain the conviction there must be no competent evidence in the record on which the verdict could be based. Ritter v. State, 84 Okla. Cr. 418, 183 P. 2d 257; Lowery v. State, 87 Okla. Cr. 313, 197 P. 2d 637. The contention, therefore, that the evidence is insufficient to support the conviction of murder is without merit.

Finally, the defendant contends that the argument of the county attorney was extremely vicious, inflam-

matory and prejudicial. Only the argument of the state's prosecutor is set out in the record. During his argument only twice did counsel for the defendant object to the argument of the county attorney. An examination of the record discloses that the first objection was not well taken, and was properly overruled. As to the second objection interposed during the prosecutor's closing argument, the record discloses that the county attorney's remarks were in response to what defense counsel had said about him as to another criminal case, as well as in relation to another case subsequently to be tried wherein the defense counsel was to appear as special prosecutor. The trial court sustained the objection of the defendant and admonished the jury not to consider the remarks of the county attorney. This contention falls within the rule announced in Ussaery v. State, 22 Okla. Cr. 397, 212 P. 137, as follows, to wit:

"When the entire argument on both sides is not before the court, and the county attorney contends that his argument is in reply to argument advanced by defendant's counsel, and the trial judge overrules the objection to such argument, this court will not pass on the alleged error, unless the argument complained of constitutes a violation of some constitutional or statutory right of the defendant. Under such circumstance the presumption will be indulged on appeal that the trial judge ruled that such argument was permissible as reply argument, as the burden is upon the appellant to affirmatively show error in the ruling of the trial court."

The record does not disclose that the argument complained of constituted a violation of the constitutional or statutory right of the defendant. The foregoing quotation is cited with approval in the recent case of Wilson v. State, 90 Okla. Cr. 180, 212 P. 2d 172. Further, in Chesser v. State, 63 Okla. Cr. 84, 73 P. 2d 191, 192, this court said:

"Ordinarily, error cannot be predicated upon mere unexplained excerpts from the remarks of counsel to the jury. Enough must appear of record to advise the appellate court of what preceded the alleged objectionable remarks and their meaning to be deduced from the context, and whether or not they were invited or provoked by remarks made by opposing counsel."

The record supports the conclusion that the objection interposed to the remarks in the closing argument of the prosecutor was apparently provoked by what had been said by counsel for the defendant in relation to the prosecutor's attitude. The evidence of guilt was so clear and convincing that if no argument had been made on either side the result would have been the same. The most eloquent argument on behalf of the defendant was undoubtedly his fine war record and his youth, and the fact that he had never been arrested or convicted before. We believe that these facts alone, combined with the excellent representation of counsel for the defendant, probably prevented the jury from inflicting the death penalty. The judgment and sentence of the trial court is accordingly affirmed.

JONES, P. J., and POWELL, J., concur.