Ray Allen YOUNG, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. 12820.

Court of Criminal Appeals of Oklahoma.

May 25, 1960.

Rehearing Denied Nov. 2, 1960.

See, also, 356 P.2d 766.

W. J. Ivester, T. G. Braddock, Stansell Whiteside, Altus, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., Loys Criswell, County Atty. of Jackson County, Altus, for defendant in error.

BRETT, Judge.

The plaintiff in error, Ray Allen Young, was charged jointly with Bernice Scott, by information, in the District Court of Jackson County, Oklahoma, with the crime of murder, 21 O.S.1951 §§ 701–707, of Highway Patrolman John Barter. The crime was allegedly committed in said county on January 23, 1959. Bernice Scott obtained a severance and was tried separately. The jury found the defendant, Young, guilty of murder and fixed his punishment at death. Judgment and sentence were entered accordingly, from which this appeal has been perfected.

In support of this appeal the defendant asserts four grounds for reversal. In his first proposition he contends that the trial court erred in failing to allow defendant, on voir dire, to examine prospective jurors for cause prior to the state, which assertedly hindered and prevented the defendant from empanelling an impartial jury to try his case. This contention is based upon 22 O.S.1951 § 691 reading as follows:

"All challenges to individual jurors must be taken, first by the defendant and then by the State alternately."

The defendant asserts that the foregoing statute is unequivocal in its language and since challenges for cause must be taken first by the defendant, it most certainly follows that the defendant should have the right to first examine prospective jurors for cause prior to examination by the state. He cites in support of this contention two cases from other states, which are contrary to the previous holdings of this Court. This contention falls within the rule of Deskin v. State, 94 Okl.Cr. 107, 230 P.2d 939, 940. Therein the Court said:

"The fact that trial court, over objection, directed counsel for defendant to first examine the jurors on their voir dire instead of the state did not constitute reversible error where there is no contention that by such procedure the accused was prevented from having a fair and impartial jury or that he suffered prejudice."

In the body of the opinion it was further said:

"Complaint is also made that the court erred in requiring the defendant to proceed first in qualifying the jury. The rules of procedure pertaining to the formation of a trial jury and the manner of taking challenges is set forth under Title 22 O.S.1941 §§ 591 to 693. There does not seem to be any express provision in these statutes pertaining to the manner of voir dire examination but by custom and practice in Oklahoma ordinarily the prosecution first examines the jurors and then the defendant. T 22 O.S.1941 § 693 is the statute governing peremptory challenges and it specifically provides that first the state and then defendant may take a peremptory challenge. Counsel for defendant has cited no statute nor decision in support of this proposition and makes no contention that he was unable to secure a fair and impartial jury because of

the manner in which the jury was examined as to their qualifications."

In Roddy v. State, 47 Okl.Cr. 283, 287 P. 765, this court held:

"The statute of this state providing for the impaneling of jurors in criminal cases is not in all particulars mandatory; a substantial compliance will be sufficient where the deviation is not material and has not prevented the accused from having an impartial jury selected by lot from the entire panel."

In 22 O.S.1951 §§ 591–693 inclusive relate to challenges and the order in which they are taken. The foregoing statutes do not pertain to the voir dire examination going to general qualifications of jurors. In some jurisdictions this examination is conducted by the court. The practice in Oklahoma has been as here-to-fore indicated in Deskin v. State, supra. The procedure embraced in this case is in keeping with the custom and practice in Oklahoma and is substantial compliance with the law, both as to qualifying the jury and as to challenges. Moreover, it has been held in Vardeman v. State, 54 Okl.Cr. 329, 20 P.2d 194, that the manner of qualifying jurors cannot be prescribed by any definite, unyielding rule. In Murphy v. State, 72 Okl. Cr. 1, 112 P.2d 438, it was held that the question of examination of jurors is usually a question within the sound discretion of the trial court and in the absence of clear showing of abuse, reversal cannot be had.

Nowhere in this record did the trial court refuse to sustain the defendant's challenges for cause, and in most instances, where there was the slightest doubt, the trial court excused the prospective juror without challenge. The jury was finally selected, composed of eleven men and one woman. It nowhere appears that a challenge for cause was registered, or denied, as to any of the twelve chosen to try this case. This contention is made to appear all the more groundless by the fact that the counsel for the defendant waived his ninth and last peremptory challenge and accepted the jury. Such situation comes within the holding of Cargo v. State, 57 Okl.Cr. 3, at page 11, 42 P.2d 551, at page 554, as follows:

"The record discloses that in selecting the jurors in this case the defendant waived his ninth peremptory challenge, thus showing he was satisfied with the twelve jurors selected, clearly showing that the defendant was not compelled to take an incompetent or prejudiced juror, and the presumption is, in the absence of a contrary showing, that the jury was composed of impartial and qualified jurors, and the defendant cannot be heard to complain if he does not get a competent jury. Coatney v. State, 52 Okl.Cr. 70, 2 P.2d 604."

This point is without substantial merit.

■ The defendant's second contention is "that the oral statement of the court to the jury and the instructions contained therein, given after the case had been submitted to the jury, and they had deliberated on their verdict for several hours, was error and prejudicial to the defendant." During their deliberations, the jury returned into court and questioned the court whether it was to consider the amount of defendant's intoxication, or influence of narcotics, in connection with "the matter of fixing sentence." The trial judge expressly told the jury that he could not add to or detract from the written instructions already given. He then proceeded to re-read instruction seven (7), correctly instructing the jury on the proposition that if they found the defendant was under the influence of intoxicating liquor or narcotic drugs, or both, to such an extent that he was unable to form a premeditated design to effect the death of John Barter, then the defendant would not be guilty of murder but guilty of manslaughter in the first degree. Then, the court made four oral statements as follows:

"There is nothing relative to intoxication in that instruction (No. 14 giving those elements necessary to conviction of murder, and reasonable doubt of intent as constituting manslaughter

in the first degree) as far as murder is concerned; the question of intoxication only goes into the question of the state of mind or intent. The lack of which makes it manslaughter."

"(Reading instruction No. 7) Homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time, but if you find the defendant, at the time he killed John Barter, was under the influence of drugs or intoxicating liquor, or both, to such an extent that he was unable to form a premeditated design to effect the death of said John Barter, then the defendant would not be guilty of murder, and your verdict should be that the defendant is guilty of manslaughter in the first degree and you should assess his punishment by imprisonment for not less than four years."

"Foreman: Except involuntary?

"The Court: Well, the question of intoxication pertains to the manslaughter portion of the Court's instructions.

"Foreman: Thank you.

"The Court: If that is all—I don't know whether I helped you any. I can't do anything further than re-read those and I am sure you can do that yourselves.

* * * * * *

"Mr. Ivester: The defendant excepts to the oral instructions of the court."

The statutes require the instructions to the jury shall be in writing. 22 O.S.1951 § 831, subd. 6. 22 O.S.1951 § 894 provides that the jury may return to the courtroom if they desire to be informed by the trial court concerning a point of law arising in the cause, during their deliberations, which is not clear to them. We have examined the instructions given and the trial court's comments in relation thereto, as above set forth. There is no material alteration in the instructions given and the trial court's oral explanations. Moreover, the court's attempt to aid the jury cannot be said to be confusing.

Bird v. State, 22 Okl.Cr. 263, 210 P. 925, 926, is decisive on this point, wherein it was said:

"While ordinarily we do not mean to approve of the giving of oral explanations of written instructions, pending the deliberations of the jury, yet under the circumstances here, where there were no specific objections to the giving of oral explanations, and where the explanations given did not amount to a material modification of the written instructions, the irregularity will be considered as waived. The defendant, at the conclusion of the remarks of the court, made this objection: 'Give us an exception to all these remarks of the court'—for what particular reason is not stated. The exception was allowed * * *."

See also Coatney v. State, 52 Okl.Cr. 70, 2 P.2d 604, to the same effect, and Townsend v. State, 37 Okl.Cr. 76, 256 P. 942. Nowhere in these proceedings do we read into them the conclusions reached by the defendant that the trial court instructed the jury that they return a verdict imposing the death penalty, or that they must exclude from their consideration all evidence of the influence of drugs. Such conclusions are unsupported by this record and constitute rank conjecture or the product of pure imagination. It is easily understood why the defendant cites no cases in support of this proposition. It is apparent that in light of Bird v. State, supra, this contention is without merit. The situation therein involved is almost identical to the facts upon which this contention is based.

The defendant's third proposition is that the trial Court erred in giving its instructions 3, 5, 6, and 7, and in refusing to give defendant's requested instructions 1, 4, 5, 6, 7, 8, and 9. The trial court's instruction # 3 is a definition of murder in the language of the Statute. T. 21, Sec. 701, Sub-Sections 1, 2, and 3:

"Homicide is murder in the following cases:

"1. When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or of any other human being.

"2. When perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.

"3. When perpetrated without any design to effect death by a person engaged in the commission of any felony."

There can be no error therein because it is a definition in the language of the statute. There is substantially no difference in the trial court's instruction No. 3 and the defendant's requested instruction No. 4. Defendant's requested instruction No. 5 is substantially covered in the Court's instruction No. 6, in fact almost verbatim. It is not error to give a requested instruction where the substance of such requested instruction is included in the instructions which are given. Stanley v. State, 97 Okl. Cr. 92, 258 P.2d 690.

The trial court's instruction No. 5 and the defendant's requested instruction No. 6 bear no substantial difference on the question of premeditated design, except for inclusion in the trial court's instruction No. 5 which contains the language of the statute, "or some other human being", (T. 21, Sec. 701, Sub-Sec. 1, O.S.A. 51) substantially the language of the statute; differing only in the word "some" for the word "any". It is contended that the inclusion of this clause, inapplicable to the evidence, was confusing to the jury. With this contention we cannot agree. While it was erroneous to include the same in instruction No. 5, the matter being entirely inapplicable to the evidence, was harmless and mere surplusage. This Court has so held in other cases, not factually in point, but from the standpoint of principle applicable hereto, Brock v. State, 39 Okl.Cr. 162, 263 P. 1115, 1118. In the body of the opinion the court said,

"The various requested instructions, so far as proper and applicable, are substantially covered by the court's general charge. The instructions as a whole, considered all together in connection with the evidence in the case, fairly and correctly state the law applicable. They contain no fundamental error nor misstatement of law calculated to mislead the jury."

In Wofford v. State, 33 Okl.Cr. 144, 242 P. 1055, the Court held:

"Where the accusation charges the illegal manufacturing of whiskey, and the case is tried on that theory, an unnecessary clause in the instructions concerning the possession of a still was harmless."

White v. State, 36 Okl.Cr. 57, 252 P. 455, holds that the allusions to the legal cash reserve was meaningless, since there was no evidence supporting such issue, and the same was harmless. Such is the situation in the case at bar relative to the statutory expression "or any other human being." The inclusion thereof in the Court's instruction No. 5 was inapplicable, and should not have been included therein, but not being covered by the evidence herein, was meaningless. The defendant was charged with the murder of John Barter and no one else, and he killed no one else. Hence he could be found guilty of the murder of no other person. The inclusion of the foregoing expression, being so palpably inapplicable to the facts of the case, could not have been confusing and misleading to the jury. The rule is correctly stated in 24 C.J.S. Criminal Law § 1922, pp. 1017–1018, supported by an abundance of authority, reads as follows:

"The giving of instructions, whether correct or not, which are abstract or are not authorized by the pleadings and evidence, will not constitute a ground for reversal where, under the circumstances, no prejudice results to accused; and the presumption is that an instruction having no application to the case made by the pleadings and

proof does not injure accused. This rule is particularly applicable where accused's guilt is clearly established by the evidence."

What has been said with reference to instruction number 5, given by the Court, is applicable also to its instruction No. 6 containing the same inapplicable expression.

The defendant next contends that the trial court erred in refusing to give his requested instruction No. 1. It reads as follows, to wit:

"Gentlemen of the jury, you are instructed that if you have a reasonable doubt that at the time the defendant shot the deceased, the defendant was under the influence of intoxicating liquor or was under the influence of narcotics or drugs, or was under the influence of both intoxicating liquor and narcotics or drugs, to such an extent that he was not able to form within his mind the premeditated design to effect the death of the deceased, it would be your duty to resolve such doubt in favor of the defendant and find him guilty of the crime of manslaughter in the first degree."

Instead of giving defendant's requested instruction No. 1, the Trial Court instructed the jury as follows in instruction No. 7:

"Homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time, but if you find the defendant, at the time he killed John Barter, was under the influence of drugs or intoxicating liquor, or both, to such an extent that he was unable to form a premeditated design to effect the death of the said John Barter, then the defendant would not be guilty of murder, and your verdict should be that the defendant is guilty of manslaughter in the first degree and you should assess his punishment by imprisonment in the state penitentiary for not less than four years."

This instruction is in conformity to the language used in other cases where the defense was intoxication or that defendant was under the influence of drugs to such an extent as to affect the ability of the defendant to form a premeditated design. Mott v. State, 94 Okl.Cr. 145, 232 P.2d 166; Myers v. State, 83 Okl.Cr. 177, 174 P.2d 395. But the defendant contends that the instruction was incomplete in that it failed to contain, following the words John Barter, the clause, "or if you entertain a reasonable doubt thereof", otherwise there can be no doubt concerning the correctness of instruction # 7. The defendant says that the omission thereof is fatal to the instruction. We have held to the contrary in an identical situation in Gaines v. State, Okl.Cr., 302 P.2d 798, at page 799, wherein we said:

"It appears from the record, herein, that the trial court did give the requested instruction defining when a homicide would be excusable, but inadvertently failed to include the last paragraph of the defendant's requested instruction as follows: 'Therefore, if you entertain a reasonable doubt as to whether or not Daisy Johnson's death was excusable as defined above, then it is your duty to resolve such doubt in favor of the defendant and return a verdict of "Not Guilty"'. He urges that the failure of the trial court to include in his definition of excusable homicide the last quoted paragraph of the instruction amounted to a failure to completely instruct the jury as to the law involved in said cause.

"In determining this contention, we must necessarily look to the instructions as a whole. In instruction No. 2, we find that the court correctly and completely instructed the jury on the proposition of the necessity of finding the defendant guilty beyond a reasonable doubt of the various degrees of homicide defined for them (i. e. murder, manslaughter in the first and second degree), before they could return a verdict of guilty. In instruction No. 6, the court defined manslaughter in the

first degree and then included in the instruction: 'Unless it is committed under such circumstances as to constitute excusable homicide.' In instruction No. 13, the court, in making an application of manslaughter in the first degree to the facts involved, likewise concluded that instruction as follows: 'Unless it was committed under such circumstances as constitute excusable homicide.'

"It is therefore apparent that the trial court not only covered the issue of reasonable doubt as contained in the last paragraph of the requested instruction, but also directed the jury's attention, in instructions No. 6 and No. 13, to the trial court's definition of excusable homicide as contained in its instruction No. 9, which, of course, was all contained in the defendant's requested instruction No. 2. Under these conditions, the trial court's failure to give the matter omitted in the defendant's requested instruction was not error, since it was adequately otherwise covered.

"It has been repeatedly held that when considered as a whole the instructions fairly and completely state the law applicable to the case, the instructions will be held to be sufficient. Holland v. State, Okl.Cr., 274 P.2d 792; Lamb v. State, 70 Okl.Cr. 236, 105 P.2d 799; Newton v. State, 56 Okl.Cr. 391, 40 P. 2d 688."

Such is the situation in the case at bar, for herein the trial court's general instructions 15, 16, and 17 adequately covered the question of reasonable doubt and when considered together with all the other instructions, and specifically, 6 and 8 and 14 relating to premeditated design couched in terms of proof beyond a reasonable doubt, there can be but one conclusion, that is, that the omission of the phrase dealing with reasonable doubt in instruction No. 7 did not result in prejudice to the defendant, since the court's instructions as a whole adequately covered the question of reasonable doubt. The trial court gave the de-

fendants first six requested instructions in substance, which met the requirements of the law. Such is the situation herein. In Myers v. State, supra, it was said [83 Okl. Cr. 177, 174 P.2d 397]:

"Where the requested instructions are sufficiently covered by the general instructions, it is not error to refuse to give the requested instructions."

As to defendants requested instructions 8 and 9, the defendant saved no exception thereto. The reason no exception was saved is apparent. The failure to give them was not regarded by the defendant as of substantial merit.

 In his fourth proposition the defendant complains of two short paragraphs in the county attorney's closing argument to the effect that if the defendant was given a life sentence, there was nothing to keep him from getting a parole, citing several instances that a life sentence did not always mean what the judgment said, "life." This was not objected to when the argument was made. It is apparent from the record that it was in reply to certain remarks by Mr. Whiteside in his discussion of the parole rule on clemency. In Hathcox v. State, 94 Okl.Cr. 110, 230 P.2d 927, 929, this court said, in a similar situation:

"Counsel for a defendant must not only object to alleged improper statements of the county attorney in his argument to the jury, but he must go further and move the court to exclude such remarks from the jury and instruct them not to consider them for any purpose, unless the remarks were of such a character that the error would not be cured by a withdrawal of the remarks.

"Ordinarily error cannot be predicated upon mere unexplained excerpts from the remarks of counsel to the jury. Enough must appear of record to advise the appellate court of what preceded the alleged objectionable remarks and their meaning to be deduced from the context, and whether or not

they were invited or provoked by remarks made by opposing counsel.

"The right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration, and argumentation is wide. Counsel for both the state and the defendant have a right to discuss fully from their standpoint the evidence and the inferences and deductions arising from it. It is only when argument by counsel for the state is grossly improper and unwarranted upon some point which may have affected defendant's rights that a reversal can be based on improper argument."

Moreover, we are of the opinion that the rule in Walker v. State, 91 Okl.Cr. 1, 214 P.2d 961, 962 is applicable herein on this point:

"When the entire argument on both sides is not before the court, and the county attorney contends that his argument is in reply to argument advanced by defendant's counsel, and the trial judge overrules the objection to such argument, this court will not pass on the alleged error, unless the argument complained of constitutes a violation of some constitutional or statutory right of the defendant. Under such circumstances the presumption will be indulged on appeal that the trial judge ruled that such argument was permissible as reply argument, as the burden is upon the appellant to affirmatively show error in the ruling of the trial court."

The defendant sets forth in his brief ten instances of what he contends is misconduct of the county attorney, prejudicial to his rights. We have examined these situations and are impressed that they concern immaterial matters which amount to nothing more than ordinary colloquy engaged in between lawyers who had been participating in a trial from April 13th, 1959, to April 16, and whose nerves had become somewhat exhausted. There was nothing in this debate, back and forth, that would rise to the height of denial of due process or constitute an invasion of the defendant's other constitutional or statutory rights. It is well to observe that in every instance where the defendant objected to the side-remarks of the County Attorney, and requested admonition to the Jury to disregard such remarks, that the trial court sustained the objection and so admonished the jury. The defendant relies on Rogers v. State, 8 Okl.Cr. 226, 127 P. 365, wherein the trial court said, that the Jury assessed the minimum penalty of four years, which indicated to the court that, "the defendant was injured by the errors committed during the trial." This statement reveals that the court was of the opinion that the record of guilt was weak, and the remarks influenced the jury. A review thereof supports the courts view. Nor does the case of Watson v. State, 7 Okl.Cr. 590, 124 P. 1101 support this contention, for therein the conduct of the county attorney was most reprehensible. No such situation confronts the court in this case; the evidence overwhelmingly impels the conclusion of guilt. The side-remarks of counsel were comparatively few in this 962 page record. Those that were engaged in were inconsequential, nothing more than ordinary sparks of legal courtroom conduct.

The defendant's testimony and that of his accomplice and co-conspirator, Bernice Scott, made out a case of premeditated murder. The jury would have been recreant to duty had it not so found.

In fact, the record herewith presented impresses us with the lack of error, none of which we find constitutes grounds for a reversal. The overwhelming evidence of guilt was inescapable. A brief review of the facts will reveal the accuracy of the foregoing statement.

The facts incident to the commission of this murder present a bold and bizzare attempt to consummate two other murders, by the defendant, Ray Allen Young, and Bernice Scott. The victim in this case was killed because he got in the way of the perpetrators; and he was removed.

Young was a taxi-driver in Altus, Oklahoma, and the Scott woman was a white prostitute in the same city. Young's nefarious design was against his former wife residing in the city of Frederick, Oklahoma, without whom he said he did not want to live. Bernice Scott's evil intent was directed toward Eddie Mayfield, a negro porter at the Shaffer Hotel in Altus. She had suggested that he accompany her to Oklahoma City, where they should live together, and presumably he should assist her in pursuing her trade as a prostitute. Admittedly, she had relations with the porter; and when Eddie Mayfield rejected her proposition, it, too, apparently shattered her love life, as well as her professional plans. She told him that if she couldn't have him that nobody could. The respective commercial enterprises of Young and Scott led them together, and at the time of the murder they were living together in Young's apartment. Young's testimony on direct examination indicated that Bernice Scott was sleeping in his bed and he on his divan, but on cross examination he admitted that he had no such divan, and that they were sleeping together. This, and other contradictions in his testimony and that of Bernice Scott and other witnesses, undermined his creditability as a witness.

On the night of the 22nd of January they planned the death of Mayfield and Mrs. Young. In consummation thereof, the next day, they purchased two pistols, took them to the country and fired them. One of the guns was defective and would not fire a second time, so they returned to Altus and obtained another in replacement, testing it behind the pawn shop from which they bought it. The conspirators had already entered into a writing, signed by them jointly, directing certain disposition of heirs and affairs. They agreed between themselves that they would never be taken alive by anybody. This explains Young's dramatic statement to Le Roy Spears, another taxi driver, who drove Young to his car where he had parked it the night before. Spears said that the defendant told him, "This will be the last time you will ever see me—this is my last go-round. I will see you in Hell and keep the home fires burning." It is apparent that both this defendant and the Scott woman did not intend to let anything come between them and their pledged fealty to one another, and the accomplishment of their planned murders.

Bernice Scott arranged by telephone to meet Mayfield on a country road, out side of Altus. She drove the defendant's car, with the defendant on the floor in the back, covered with her coat. Both of them were armed with their pistols when Mayfield drove up and Bernice spoke to him, and he rolled down his window to hear, at which time she asked him to get out and come over to the car where she was. Mayfield was frightened and refused. She then drew her pistol on him and shot through his car window at him. Mayfield opened the door on the opposite side, jumped out and ran across a field in his escape. Bernice Scott jumped out on the ground and fired at Mayfield five times. The defendant, Young, got out and fired twice at Mayfield, but he got away. They confessed that it was their intention to hunt him down and kill him, until the highway patrolman, John Barter, appeared, and made inquiry concerning the shooting. He was informed that they were having a little target practice. Barter asked for the guns, but they told him they only had one gun. Barter put that gun in the patrol car and was returning to the defendant's car, when he was shot from the side through the heart, after dead aim with the pistol leveled on the car door window. The patrolman stepped behind his car and fell, dying, the victim of the defendant's intention to brook no interference and to give no quarter until the consummation of his evil designs. The defendant said that he "hated to kill Barter", indicating that he just got in his way; that "he didn't aim for anyone to keep him from killing Sylvia." The defendant got under the wheel of his car, but before leaving, Bernice Scott took a parting shot at Mayfield's car tire, then they drove away to kill Sylvia Young. On the way to Fred-

erick they meditated kidnapping several people as a hostage and shield. Also, the defendant intended to rob a hunter of his shotgun, but some little children appeared to thwart that scheme. The defendant and the Scott woman drove to the Curtis cafe in Frederick, where Mrs. Young was employed as a waitress. Defendant went inside the cafe and fired three shots at Sylvia Young, who fled and escaped the bullets. Thereafter, both defendant and Bernice Scott had car trouble and, abandoning it, they went to Young's brothers' home, where they called a cab and hired the driver to take them to Durant, Oklahoma. Near Randelett, Oklahoma, they were apprehended. Bernice Scott begged the defendant to shoot the patrolman, she even tried to get the gun so that she could do so, but to no avail. The defendant's plans could include the life of one, and attempts upon two others, but his own life he could not spare, even in face of disloyalty to his pledged conspirator's oath to stick together even unto death.

It further shows that after incarceration, Young effected an escape, robbed Mr. and Mrs. Robert Finney, of their 1959 Chevrolet, at knife point, drove to his wife's place of employment, and forced her to accompany him. He stopped on the highway and told Sylvia Young that he was going to kill her. The defendant choked her almost into insensibility, but finally agreed with her that they should commit suicide together by forcing the officers to kill them. The record shows that he said he was afraid to die alone. When the officers came he again failed the pledge and offered no resistance. He could take the life of the innocent, but his own he could not give, even in execution of a death pact to do so.

■ The gist of the defense in this case was that defendant was so under the influence of whiskey and drugs (dexedrene, yellow jackets and redbirds) that he was incapable of forming a premeditated design. His testimony in this regard is contradicted by Bernice Scott. She said that while they drank a half-pint of whiskey and took some dexedrene about 1:30 p. m. that they both were sober, and that both knew what they were doing. Ray Young's driving was without lack of control at a speed of 55 to 65 miles per hour. She said that he never drove recklessly any of the time. In this she was corroborated by reputable citizens who gave testimony to defendant's demeanor, his bearing, his appearance, and his ability to handle himself and operate his automobile. On the other hand, there were defense witnesses who testified that he looked like a man under dope. The State's witnesses said that he was excited but otherwise normal. But this sharp conflict in the evidence presented a question of fact for the jury, as this Court has repeatedly held. Sadler v. State, 84 Okl.Cr. 97, 179 P.2d 479.

■ In addition to proof of killing patrolman Barter, and attempting to take Eddie Mayfield's life, this record shows that the defendant admitted making three attempts to take the life of Sylvia Young; once in a prior case by stabbing her in the left breast with a knife, by shooting at her, and by choking her. He coolly admitted that he was sorry he missed her when he shot at her. In Noel v. State, 17 Okl.Cr. 308, 188 P. 688, this court said in substance that the death penalty is justified in extreme cases and against the totally depraved. We are of the opinion that the facts of this case present such a situation.

Under this record we can justify no other but that the defendant was found guilty after a fair trial and that the record is free from fundamental and prejudicial error. The judgment and sentence is accordingly affirmed. The warden is directed to execute the judgment and sentence on the *26th. day of July, 1960.*

POWELL, P. J., concurs.

Memorandum by NIX, Judge.

I have carefully examined the record in this case and find no error of law upon which to base this Court's interference with the verdict of the jury.